## ALEXANDER *v.* RYAN.

JENKINS, Chief Justice.  1.  Prior to the act of 1893 (Code, § 34-3001 et seq.), it might seem that the Governor was the proper official to determine issues raised in an election contest.  Code, 1873, § 1329 et seq. Under the law as it then existed, Judge Bleckley, speaking for the court in *Hardin* v. *Colquitt,* 63 *Ga.* 588, 592 (2), observed: "Taking all of these provisions together, there is a very powerful indication of a purpose to concentrate all disputes touching the results of elections by the people, when the person elected is to be commissioned by the Governor, before him, and to make his commission final."  Therefore, under the old law, even in the absence of a contest, after the Governor had examined the returns of all elections of officers made to his department, and determined on the face of the returns the person receiving the greatest number of votes, and issued his commission on the basis of such determination, his decision in the matter could not ordinarily be inquired into in a subsequent proceeding.  *Corbitt* v. *McDaniel,* 77 *Ga.* 544 (2 S. E. 692); *Ginn* v. *Linn,* 83 *Ga.* 180 (9 S. E. 784).  But see *Low* v. *Towns,* 8 *Ga.* 360 (2), 367; *Hardin* v. *Colquitt,* 63 *Ga.* 588, 592 (2).  However, under present laws providing that in contested election cases the issues, when the person elected is to be commissioned by the Governor, shall be adjudicated by the judge of the superior court, it has been uniformly held that, in cases where there is no contest, it is the duty of the Governor to issue the commission to the person whose election is certified by the proper authorities; and where there has been a contest, to the person adjudged by the special tribunal to determine

the result by contest proceedings as entitled to the commission, and in so doing his act is merely ministerial. While such a commission issued by the Governor is prima facie evidence of the right to office, it is not conclusive, and it is therefore competent for the judiciary to go behind the commission and to inquire into the right of the person so commissioned to exercise the functions of the office. *Hathcock* v. *McGouirk*, 119 *Ga.* 973 (47 S. E. 563); *McCants* v. *Layfield*, 149 *Ga.* 231, 232 (3) (99 S. E. 877); *Bennett* v. *Public Service Commission*, 160 *Ga.* 189, 192 (127 S. E. 612); *Stephenson* v. *Powell*, 169 *Ga.* 406, 408 (2) (150 S. E. 641); *DeGraffenried* v. *Allen*, 172 *Ga.* 249, 252 (157 S. E. 280).

(*a*) Under the above ruling, the contention of the respondent Ryan, to the effect that the commission issued to him by the Governor is final in the sense that it precludes the relator Alexander from instituting a proceeding in the nature of a quo warranto to prevent an alleged usurpation of office, is without merit.

(*b*) The contention of the relator Alexander, that any question of the legality of the votes cast in the election cannot be determined in a quo warranto proceeding, is under the particular circumstances of this case without merit; for, while it is true that "a quo warranto proceeding cannot be converted into an election contest" (*Stephens* v. *Wohlwender*, 197 *Ga.* 795, 30 S. E. 2d, 470), and while Ryan, the respondent, not having received a majority on the face of the returns, could not have brought a quo warranto proceeding in order to show that a controlling number of ballots cast for his opponent were illegal (*Hathcock* v. *McGouirk*, 119 *Ga.* 973, 47 S. E. 563; *Cutts* v. *Scandrett*, 108 *Ga.* 620, 34 S. E. 186), this is a very different thing from precluding a respondent in a quo warranto proceeding, instituted by a party claiming to have received a majority of the legal votes cast in an election, from defending his right to the office under prima facie title by virtue of a commission issued to him by the Governor by showing that the votes cast for his opponent claiming the majority were illegal. The reason an unsuccessful candidate cannot contest an election in a quo warranto proceeding is that the statute (Code, § 34-2801 et seq.) provides the sole and exclusive method by which an *unsuccessful* candidate may go behind the election returns, and therefore the court in which the quo warranto proceeding is instituted has no jurisdiction of the subject-matter. *Cutts* v. *Scandrett*, 108 *Ga.* 620 (34 S. E. 186). But since the respondent in this case held prima facie title to the office under the commission issued to him by the Governor, he would not be required to seek to obtain by a contest that which he already has prima facie title to, and already is in possession of; and where, as here, the candidate having the majority of the votes as shown by the face of the returns institutes the quo warranto proceeding to contest the right of the respondent who holds the office under prima facie title, the court thereby acquires jurisdiction of the subject-matter (*Hathcock* v. *McGouirk*, 119 *Ga.* 973, supra), and manifestly the respondent in such a proceeding is entitled to defend his right to the office under the commission by going behind the face of the returns and showing, if he can, that the votes cast for the relator were illegal.

2. The Code (Ann. Supp.), § 34-1904, taken from Ga. L. 1922, p. 100; 1943, p. 292, provides as follows: "In all elections other than primary

elections held under the auspices of a political party, it shall be the duty of the ordinary to provide . . at the expense of the county, . . official ballots for all such elections,.having printed thereon, in separate columns, the names of the candidates of each political party, designating the names of the political party to which they belong, and also the names of any other candidates for the offices to be filled at said election. . . Provided, however, it shall not be the duty of said officers to place the names of any candidates on said official ballots, unless notice of their candidacy shall be given in the following manner, to wit: All candidates for national and State offices, or the proper authorities of the political party nominating them, shall file notice of their candidacy, giving their names and the offices for which they are candidates, with the Secretary of State, at least 30 days prior to the regular election." The act approved February 1, 1946 (Ga. L. 1946, p. 75) provides that the Secretary of State shall certify to the respective ordinaries the names of all candidates for national and State offices, who have qualified as such as provided in the above-quoted Code section, and further provides: "The ordinaries of the respective counties shall not be required to add any other names for national or State officers on the official ballot, except upon certificate of the Secretary of State."

(a) The manifest purpose of the above statute was to provide a definite procedure to govern the ordinaries of the 159 counties throughout the State in placing the names of the various party candidates upon the official ballot in an orderly and uniform manner. Construing the provisions of the statute as a whole in the light of the evils sought to be remedied, the statute was clearly intended to provide the sole and exclusive method by which a party candidate could have his name placed on the official ballots by the various ordinaries. While it is true that such intention may have been expressed in the negative by the use of such language as "Ordinaries of the respective counties *shall not be required* to add any other names for national and State offices on the official ballot," nevertheless the language is positive and · unequivocal in asserting that the Secretary of State shall certify to the respective ordinaries the names of all candidates for national and State offices; and when taken together with the negative assertion that the ordinaries shall not be required to add any other names, the import is clear that no names are to be placed upon the official ballot except upon certificate of the Secretary of State. Any other construction would necessarily result in an uncontrolled and unpredictable exercise of individual discretion on the part of the numerous ordinaries, the natural consequence of which would be to do violence to the entire scheme and purpose of the legislation.

(b) It appears from the stipulated facts that, after the Democratic primary had been held, a vacancy occurred in the office of Solicitor-General of the Eastern Judicial Circuit, composed of the County of Chatham; and that, upon the assemblage of the Democratic State Convention, it nominated the relator Alexander as the Democratic candidate to fill the unexpired term of such office. It further appears that although the General Election was to be held less than 30 days after the date of the convention, it sent a list of all of the Democratic nominees, including the name of the relator Alexander, to the ordinaries of each

of the 159 counties in Georgia with instructions in most positive terms that the names of all such nominees should be placed upon the official ballot as the nominees of the Democratic party. Under the statutory law as quoted, and in view of the stipulated facts of this case, it was impossible for the relator Alexander to have complied with the law requiring that his name be filed as the party candidate with the Secretary of State 30 days prior to the General Election. The Secretary of State was therefore correct in acting upon the advice of the Attorney-General and in refusing to certify the name of the relator Alexander to the various county ordinaries; but acted in accordance with the statutory law in instructing the ordinaries not to place his name on the official ballots, by reason of the fact that his name had not been filed as a candidate within the prescribed time. It follows, therefore, that the name of the relator Alexander could not legally have appeared as the candidate of the Democratic party upon the official ballots prepared by the county ordinaries and furnished by them to the election managers. It further appears that Alexander personally wrote the ordinaries of each county, requesting that his name be placed on the official ballot, and furnished each of them a rubber stamp for the purpose of prestamping the ballots with his name as the Democratic nominee, and offered to reimburse them for the expenses incurred in so doing. It appears further that the ordinaries of 76 counties did in fact stamp the name of Alexander on the official ballot as the Democratic nominee, and that Alexander reimbursed 39 of said ordinaries for the expenses thus incurred. While under the law the sovereign voter himself could have written in the name of any candidate as he might see fit, and the ordinaries were so informed by the Secretary of State, the question is whether or not, under the above circumstances, the votes cast for Alexander in the subsequent general election in the 76 counties thus involved are to be declared null and void. It is shown by the stipulated facts that, if the votes cast for Alexander in these counties be discarded, the respondent Ryan would hold a clear majority.

3. "No election shall be defeated for noncompliance with the requirements of the law, if held at the proper time and place by persons qualified to hold it, unless it is shown that, by such noncompliance, the result is different from what it would have been had there been proper compliance." Code, § 34-3101; *Jossey* v. *Speer*, 107 *Ga.* 828 (3) (33 S. E. 718); *Slate* v. *Blue Ridge*, 113 *Ga.* 646 (3) (38 S. E. 977); *Chamlee* v. *Davis*, 115 *Ga.* 266 (5) (41 S. E. 691); *Coleman* v. *Board of Education*, 131 *Ga.* 643 (9) (63 S. E. 41); *Brumby* v. *Marietta*, 132 *Ga.* 408 (64 S. E. 321); *Brown* v. *Atlanta*, 152 *Ga.* 283 (4) (109 S. E. 666); *Stewart* v. *Cartwright*, 156 *Ga.* 192, 200 (2) (118 S. E. 859). In applying the rule as set forth in the above-quoted Code section, this court has said in *Coleman* v. *Board of Education*, 131 *Ga.* 643 (9) (63 S. E. 41), with respect to votes cast from unpurged voting lists, and with respect to a situation where no voting list was furnished at all, and where there had been an illegal consolidation of the returns: "[All] are irregularities resulting from a failure to observe statutory provisions which are merely directory, and in the absence of any fraud or evidence that persons had voted who were not authorized to vote, or had been

deprived of voting who were entitled to vote, and that such votes would have changed the result of the election, will not be sufficient cause to set aside the entire election." In applying the provisions of the quoted Code, § 34-3101, in *Adair* v. *McElreath*, 167 *Ga.* 294, 316 (145 S. E. 841), this court has approved and applied a statement quoted by it from 9 R. C. L. 172, 173, § 161, as follows: "All provisions of the election law are mandatory if enforcement is sought before election in a direct proceeding for that purpose; but after election all should be held directory only, in support of the result, unless of a character to effect an obstruction to the free and intelligent casting of the vote, or to the ascertainment of the result, unless the provisions affect an essential element in the election, or unless it is expressly declared by the statute that the particular act is essential to the validity of an election or that its omission renders it void." See also *Hooper* v. *Almand*, 196 *Ga.* 52, 81 (25 S. E. 2d, 778).

In the instant case, since we have adjudicated that the Secretary of State as the legally constituted authority had "certified" the names of candidates to the ordinaries, and in doing so had omitted from the list the name of the relator Alexander as the Democratic nominee, and that his action in so doing was in accordance with the statutory law of this State, can it be said that the action of the relator in circumventing this correct ruling of the constituted authority, by thereafter having his name stamped on the official ballot by the ordinaries of 76 counties as the Democratic nominee, did not in the language of the *Adair* case constitute "an essential element of the election"? What could possibly constitute a more vitally essential element in any election than the contents of the official ballot furnished to the voters? If a legal ballot was supplied by the duly constituted authority omitting the name of the relator, but thereafter by reason of the action on his part a ballot prohibited by law containing his name was substituted, his action in so doing was illegal; and this being true, was not the ballot itself, insofar as this candidate was concerned, inherently and essentially illegal? If so, was it made legal by being voted just as it was presented to the voter, when the only preference expressed by the voter was in accordance with the terms of the official ballot as presented to him? As was said in *Hooper* v. *Almand*, 196 *Ga.* 52 (supra), the voter had a right to expect that the legally designated "officials would do their duty," and that the name of the relator was there because it belonged there. Under the ruling which had been made in the *Hooper* case, the successful candidate in that election was properly entitled to have his name appear on the ballot, and if placed there properly, but by the wrong official, this did not destroy the voter's right to take the correct form of ballot as he found it. Accordingly, the language used in the *Hooper* case that an irregularity, even to the extent that the candidate "had no right to have his name on the ballot," was mere obiter and cannot be controlling here; especially so since, after the rendition of the decision in that case the law has made it the express duty of the Secretary of State, not only to furnish the "form" of the ballot as was formerly required of the Governor, but for the first time it has been made his express duty to "certify the names of all candidates." In this

case, while the Democratic Convention declared the relator its nominee, the convention like everyone else was bound by the statutory law of the State, and therefore could not at that late day declare a nominee one who was not entitled to be printed as such on the official ballot to be used at the near approaching election. His name, of course, could be written in; but if the law meant what it says, his name could not be stamped or printed in the official form of the ballot to be furnished to the voters. The law says that it could not; the proper constitued authority therefore said that it should not; but the nominee candidate overrode both, and procured the stamping of his name on the ballot as furnished the voters in 76 counties. We would not care to use the word fraudulent in designating the relator's conduct. It was openly done in the zeal of a political contest, in which he had been declared the nominee by the party convention, and he doubtless thoughtlessly and in good faith misconstrued the contrary mandate of the law to the extent of believing that, being the nominee, he had the right under any circumstance to be so designated on the official ballot. But we cannot escape the conclusion that the official ballot as furnished the voters, insofar as it carried his name, was inherently and essentially invalid, and we are unable to see how it could be validated by being voted as presented under a natural misapprehension that it belonged there. As already stated, the voter was entitled to understand that the ballot was legal as presented, and in thus voting it he acted upon a mistaken assumption, and this is enough to vitiate such ballots as were cast in favor of him who was directly responsible for the illegal act. Nothing could possibly be more important than the sanctity of the ballot. It transcends in gravity far beyond any question as to who in any given case might be entitled to a particular office.

If, as it has been sought to show, the stamped ballots were prohibited by law and were therefore inherently illegal, and their distribution to the voters was unauthorized, and if the ballots being voted as furnished and under a misapprehension of their validity did not operate to validate them, they should unquestionably be discarded. The face of the returns showed the following result:

|  | In Chatham County (All Write-in Votes). | Remaining Counties other than Chatham where ballots were not pre-stamped. | In the 76 Counties where ballots were pre-stamped. |
|---|---|---|---|
| Ryan | 13,420 | 3,012 | 40 |
| Alexander | 3,484 | 795 | 35,474 |

The illegal ballots should not be retained and counted as valid on the theory that, had a legal ballot been furnished, it is possible to conceive that the voters might have written in the name as that illegally stamped upon the official ballots. This they theoretically might have done, but this they did not do, nor were they given an opportunity so to do because the ballot *actually* presented carried with it a statement which, even though true, the law expressly forbade to be made under the facts as stipulated.

It is true that no election will be defeated for noncompliance with the law unless it is shown that such noncompliance operated to change the result. But such fact is shown where, as here, it takes ten or twelve

thousand of the illegal ballots in order to elect the relator, and where only 40 of all the illegal votes were received by the respondent Ryan. If the respondent Ryan had sought to show that a sufficient number of persons had been illegally deprived of voting to change the result, it would have been necessary for him to show further that such persons would have voted for him and not for his opponent. Here the illegal ballots, all but 40 of which were cast for the relator Alexander, must be discarded, which leaves the election just as if these voters had not voted or sought to vote at all insofar as this particular office was concerned. If the ballots as procured by the relator himself were illegal as being prohibited by law, and therefore subject to be discarded, he cannot be heard to complain, since it was by virtue of his own acts that such a procedure is necessitated. *Tanner* v. *Wilson*, 193 *Ga.* 211, 215 (17 S. E. 2d, 581). As was said in *McDougald* v. *Bellamy*, 18 *Ga.* 412 (6), "No one shall derive a benefit from the violation of the law, or from a fraud practiced by himself or others, to his own advantage." See also 1 C. J. S. 997, § 13; *Johnson* v. *Ellis*, 172 *Ga.* 435 (9) (158 S. E. 39).

Since it appears without dispute that the respondent Ryan received a majority of the unaffected ballots, it follows that the court did not err in denying the prayers of the relator Alexander. Direction is given that the judgment of dismissal be vacated and that it be limited to a denial of the prayers.

Under the view which we have taken of the case, it is unnecessary to consider the further contention of the respondent Ryan, that the case could be determined by the vote in Chatham County only where he received a large majority, for the reason that Chatham is the only county where the form of the ballot correctly showed that the office to be filled was that of the unexpired term of Samuel A. Cann, Solicitor-General of the Eastern Circuit, and not the office of Solicitor-General of the Eastern Circuit, as the form of the ballot in all the other counties indicated. .

*Judgment affirmed, with direction. All the Justices concur.*

No. 15888. July 10, 1947. Rehearing denied July 22, 1947.

*B. D. Murphy, James A. Branch, Thomas B. Branch Jr., Gilbert E. Johnson, John J. Hennessy, Dennis Pierce, Lawrence J. Dwyer,* and *James W. Hennessy,* for plaintiff.

*T. Mayhew Cunningham, E. J. Haar, W. Hugh Stephens, Aaron Kravitch, Phyllis Kravitch, Julian F. Corish, Andrew A. Smith, Marvin O'Neal Jr.,* and *Thomas H. Gignilliat,* for defendant.