## S98A0654. HUNT v. CRAWFORD.
(507 SE2d 723)

SEARS, Justice.

Lyn Hunt appeals from the trial court's judgment setting aside an election in which she defeated Robert Crawford, by a margin of ten votes, for a seat on the Madison City Council. Because we conclude that the trial court erred when it found that Crawford demonstrated that the alleged misconduct of which he complained placed the result of the election in doubt, we reverse.

Crawford contested Hunt's victory in the election based upon the activities of Hunt's brother on election day. Before election day, Hunt had named her brother as her poll watcher.[1] According to Hunt's brother, on election day, Hunt gave him a list of about seven to ten of Hunt's supporters, and asked if he could determine if they had voted as the day progressed. At the hearing on Crawford's election contest, Hunt's brother testified that he looked at the list of persons who had voted, compared it to the list of supporters supplied by Hunt, and reported to her later that day the names of supporters who had voted. David Nunn, the Election Superintendent, once aware of the situation, asked Hunt's brother to refrain from looking at the voter list. In his complaint, Crawford contended that Hunt's brother had violated OCGA § 21-3-317 (c), which prohibits poll watchers from "talking to voters, checking lists of electors, or participating in any other form of campaigning." The trial court found (1) that Hunt's brother's activities violated § 21-3-317, and (2) that the misconduct

---

[1] See OCGA § 21-3-317.

had placed the result of the election in doubt. On appeal, it is unnecessary to decide whether Hunt's brother's activities violated § 21-3-317, because, even assuming that they did, we conclude that the trial court erred when it found that the violation of § 21-3-317 placed the result of the election in doubt. Accordingly, we reverse.[2]

It is presumed that election returns are valid, and the party contesting the election has the burden of showing an irregularity or illegality sufficient to change or place in doubt the result of the election.[3] For the reasons that follow, we conclude that Crawford failed to carry that burden.

At trial, Hunt admitted making telephone calls to six voters as a result of her brother's use of the voter lists, and Crawford had four voters testify at trial regarding the election. Some of the voters in question were married. Including spouses, the evidence introduced at trial concerned 12 potential voters. They were Susan Kelly; Natalie Rafferty and her husband; Bruce Morrill and his wife; Barbara Sims and her husband; Marci Miller, who is single; Cynthia Clark, who is single; Randy Brookins, who is single; and Jimmy Nolan and his wife.

Susan Kelley, who lives two houses from Hunt, testified that she went to work on the morning of the election, but that when she left home, she left herself a note reminding herself to vote when she returned home that evening. She added that she arrived home from work about 6:30 p.m., and had not voted. A few minutes later, Hunt arrived in person at her home. She testified that, upon seeing Hunt, she (Ms. Kelley) volunteered that she had not voted, and that Hunt did not say anything to her about voting. Kelley added that Hunt invited her to her house for a party. When Hunt testified, she stated that Kelley was not one of the voters that she called as a result of her brother's activities; that she stopped by Kelley's house to invite her to an election night party; and that she did not remind Kelley to vote when she did so. Because Hunt and Kelley both testified that Hunt did not mention voting to Kelley; because Kelley's testimony is consistent with Hunt's testimony that Kelley was not contacted because of her brother's activities, but because she wanted to invite her to a party; because Kelley stated that she had left herself a note to vote when she arrived home from work; and because Crawford offered no evidence contradicting Hunt's and Kelley's version of events, we cannot conclude that Crawford carried his burden to show that the

---

[2] Similarly, because of our holding that the trial court erred in ruling that the misconduct placed the result of the election in doubt, we need not address Hunt's contention that a poll watcher is not an "election official" within the meaning of OCGA § 21-3-422 (1).

[3] *Streeter v. Paschal*, 267 Ga. 207, 208 (1) (476 SE2d 759) (1996); *Bailey v. Colwell*, 263 Ga. 111 (428 SE2d 570) (1993); *Johnson v. Rheney*, 245 Ga. 316 (1) (264 SE2d 872) (1980).

alleged misconduct caused Kelley to vote.

Natalie Rafferty also testified that she received a phone call around 3:00 p.m. on behalf of Hunt asking her to vote, and that she voted sometime after 5:00 p.m, but had been planning on voting anyway. In Hunt's testimony, she stated that Rafferty was one of the six people she called as a result of her brother's activities. As for Rafferty's spouse, however, Crawford elicited no testimony regarding whether Rafferty communicated the message to her husband or whether, if she did, her husband had already voted. In the absence of such evidence, we cannot conclude that Crawford carried his burden to prove that the alleged misconduct caused Rafferty's spouse to vote and that his vote therefore should be discounted. If we were to hold otherwise, votes properly cast could be nullified based merely upon speculation. A person's constitutional right of suffrage should not be so easily cast aside.[4] In addition, when Hunt's attorney stated in his place that Rafferty's spouse was out of town on business on the day of the election, and had cast an absentee ballot before he left town, Crawford raised no objection. Thus, although Crawford carried his burden to show that Rafferty's vote should be discounted, he did not do so with regard to Rafferty's spouse's vote.

Another voter named Bruce Morrill testified that he received a phone call sometime after 6:00 p.m. from his next-door neighbor, Sandy Wood, an active supporter of Hunt, asking him if he had voted. He added that Wood did not ask him to vote for Hunt, and that, when he received the call, he was on his way to eat dinner and to vote. Crawford did not call Wood to testify, and established no connection, other than conjecture, between the alleged misconduct and Morrill's vote. Moreover, Hunt testified that only she and several of her relatives made phone calls based upon the information that she received from her brother, and that Morrill was not one of the people who was called. Based upon this evidence, we conclude that Crawford failed to carry his burden to show that Morrill's vote should be discounted. Likewise, for the reasons given with regard to Rafferty's spouse, we conclude that Crawford failed to carry his burden to prove that Morrill's spouse's vote should not be counted. Moreover, the evidence showed that Morrill's spouse was not home that election night, as Morrill testified that he had the children that night because his spouse went to graduate school on Tuesday nights at that time.

Barbara Sims was also called to testify by Crawford. She stated that she and her husband worked all day on election day; that she had been on the road traveling all day for work; that she and her husband got home between 6:30 and 7:00 p.m; and that they had met

---

[4] See *Malone v. Tison*, 248 Ga. 209, 213-214 (282 SE2d 84) (1981).

and voted before they went home. She also added that they received a message late in the day asking them to vote. Because she had been traveling all day; because the other messages that were discussed at trial were left at the voters' homes; and because, when asked whether she listened to the message or whether her husband did, she responded not that she got the message at work, but that she listened to the message, it is equally as reasonable to infer that she received the message at home after she had voted as it is to infer that she received the message earlier in the day and voted as a result thereof. Moreover, for the same reasons as that given with regard to Rafferty's and Morrill's spouses, we cannot conclude that Sims's spouse's vote should be discounted. Thus, we cannot conclude that Crawford carried his burden to show that the votes of these two voters were tainted. Their votes thus cannot be considered in determining whether the alleged misconduct affected the outcome of the election.

The foregoing voters were the only ones called to testify by Crawford, and, as the above discussion illustrates, we conclude that the evidence is sufficient to discount only one of those votes, that of Rafferty. The only other evidence of tainted votes was Hunt's testimony that she called five additional people, one of whom was married.[5] Coupling Rafferty's vote with the six votes stemming from Hunt's testimony, we must conclude that Crawford only demonstrated that seven votes at most ought to be nullified. Moreover, there was no evidence introduced at trial from which it can be inferred that the alleged misconduct was more widespread than the record indicates.

"There is a sanctity to elections under our system of self-government, wherein the will of the people . . . is the supreme law."[6] The setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly,[7] but instead should be reserved for cases in which a person challenging an election has clearly established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt. Under the circumstances of this case, and deferring to the trial court as the finder of fact, we are compelled to conclude that there is no evidence in the record that any more than seven votes could have been affected by the alleged misconduct, and thus no evidence to demonstrate that the alleged misconduct placed in doubt the result of the election. For this reason, we reverse

---

[5] For purposes of this discussion only, we will assume that the vote of the spouse of the married person that Hunt called based upon her brother's information should not be counted.

[6] *Stiles v. Earnest*, 252 Ga. 260, 262 (312 SE2d 337) (1984).

[7] See *City of Arcade v. Emmons*, 268 Ga. 230, 233-234 (486 SE2d 359) (1997)

the trial court's judgment.
*Judgment reversed. All the Justices concur.*

DECIDED OCTOBER 22, 1998.

*Troutman Sanders, Norman L. Underwood, Wayne R. Vason, Robert W. Kamerschen,* for appellant.
*Eugene P. Baldwin, Lambert & Roffman, Allan R. Roffman,* for appellee.