S04A1982. MEAD v. SHEFFIELD et al.
(601 SE2d 99)

CARLEY, Justice.

The facts in this case are undisputed. After a recount of the votes cast in the statewide election held on July 20, 2004 to select a successor to Judge Frank Eldridge on the Court of Appeals of Georgia, Mike Sheffield ran second with 207,473 votes and Howard Mead finished third with 207,091 votes. Thus, by a 382-vote margin, Sheffield won the right to participate in a run-off election with Debra Bernes, who was the top vote-getter by over 100,000 votes. However, Mead filed suit, alleging that the number of illegal absentee ballots cast in Laurens County was sufficient to render the outcome of the election in doubt. In that county, some 481 absentee ballots containing the incorrect name "Thomas Mead," rather than the correct name "Howard Mead," were returned and counted. Of that number, 314

contained votes in the Court of Appeals race, with 71 cast for "Thomas Mead," 58 for Sheffield, and the remaining 243 split among the other candidates.

The trial court found against Mead's claim, focusing on the 314 ballots which contained votes for candidates in the contested Court of Appeals race. According to its analysis, if Mead is credited with 71 votes, then the remaining 243 votes would not be sufficient to meet the 382-vote threshold for questioning the outcome of the election. Mead filed a notice of appeal, and this Court issued a stay of the election pending resolution of the appeal.

OCGA § 21-2-284 (c) provides, in relevant part, that "the names of all candidates who have qualified . . . shall be printed on the ballots . . . ." "Shall" is generally construed as a word of command. *O'Donnell v. Durham*, 275 Ga. 860, 861 (3) (573 SE2d 23) (2002). Although he was a qualified candidate, the name of "Howard Mead" did not appear on the disputed Laurens County absentee ballots. Instead, the name of "Thomas Mead" appeared thereon.

> The word "name" " 'has been defined as the word or combi-nation of words by which a person is distinguished from other individuals' and 'consists, in law, of a given . . . name, and a family surname . . . . The . . . [given] name . . . has been used from early times to distinguish a particular individual from his fellows . . . . Consequently, it has always been considered an essential part of a person's name . . . .' [Cits.]" [Cit.]

*Maye v. Pundt*, 267 Ga. 243, 245 (1) (477 SE2d 119) (1996).

As a matter of law, therefore, the 481 Laurens County absentee ballots did not comply with the mandate of OCGA § 21-2-284 (c). The names of all of the qualified candidates in the contested Court of Appeals race were not listed on those ballots, since the name of "Howard Mead" did not appear.

> [Nothing] could possibly constitute a more vitally essential element in any election than the contents of the official ballot furnished to the voters[.] If a legal ballot was supplied by the duly constituted authority omitting the name of [an indi-vidual], but thereafter by reason of the action on his part a ballot prohibited by law containing his name was substi-tuted, his action in doing so was illegal; and this being true, . . . the ballot itself, insofar as this candidate was concerned, [was] inherently and essentially illegal[.]

*Alexander v. Ryan*, 202 Ga. 578, 582 (3) (43 SE2d 654) (1947). Thus, adding an unauthorized name to a ballot makes it illegal. Likewise,

where, as here, the voters are supplied with a ballot which omits the name of a qualified candidate, then the ballot itself is illegal as to that race. See *Howell v. Fears*, 275 Ga. 627 (571 SE2d 392) (2002) (primary results invalid where ballot in one precinct omitted names of both qualified candidates).

Notwithstanding the illegality of the Laurens County absentee ballots, the trial court relied upon the principle that the plaintiff in an election contest " 'must show that a sufficient number of electors voted illegally or were irregularly recorded *in the contest being challenged* to change or cast doubt on the election. . . .' " (Emphasis in original.) *Taggart v. Phillips*, 242 Ga. 484, 487 (249 SE2d 268) (1978). Because the number of absentee ballots containing actual votes in the contested Court of Appeals race was only 314, which is fewer than Sheffield's statewide margin of victory, this election contest was found to be without merit.

The trial court erred in relying upon this principle because it is inapplicable, since this case is not an election contest involving electors who voted illegally or legal votes which were irregularly recorded. Compare *Middleton v. Smith*, 273 Ga. 202 (539 SE2d 163) (2000) (irregularities in conduct of election); *Bailey v. Colwell*, 263 Ga. 111 (428 SE2d 570) (1993) (improperly cast, not illegal, ballots); *Taggart v. Phillips*, supra (illegal voters, not illegal ballot); *Miller v. Kilpatrick*, 140 Ga. App. 193 (230 SE2d 328) (1976) (illegal voters, not illegal ballot). Instead, Mead's contention is based upon the irregularity of the absentee ballots and the illegality of those that were returned and counted. Grounds for contesting an election include "irregularity by any primary or election official or officials sufficient to change or place in doubt the result" and the receipt of "illegal votes . . . at the polls sufficient to change or place in doubt the result." OCGA § 21-2-522 (1), (3). Thus, rather than illegal voters or irregular recording, the issues here are the preparation of an irregular ballot and the receipt of illegal votes. The irregularity occurred when election officials issued absentee ballots that failed to contain Mead's name. The evidence shows that 481 of the irregularly prepared absentee ballots were returned in Laurens County. Since 481 is greater than Sheffield's margin of victory, the dispositive factor is the illegality of the total number of absentee ballots that were returned, not the limited number of those ballots which contained votes in the contested Court of Appeals race. "Where the omission is of an essential prerequisite to the holding of a valid election, such as . . . the contents of the ballot itself, the election is, of course, invalid. [Cits.]" *State of Ga. v. Carswell*, 78 Ga. App. 84, 88 (2) (50 SE2d 621) (1948), statutorily superceded on other grounds, *Maye v. Pundt*, supra at 246 (2), fn. 13. The electors who received the irregular ballots did not cast illegal votes. As qualified electors they cast legal votes on an irregular

ballot. However, because the irregularity relates to the list of quali-fied candidates from whom the electors were selecting, the

> ballots were prohibited by law and were therefore inherently illegal, and their distribution to the voters was unauthorized, and if the ballots being voted as furnished and under a misapprehension of their validity did not operate to validate them, they should unquestionably be discarded.

*Alexander v. Ryan*, supra at 583 (3).

The fallacy in the trial court's analysis is demonstrated by the impossibility of determining how the 481 electors would have voted had they been supplied with proper ballots. Any number of the 243 who voted for other candidates may have voted for "Howard Mead" if that name appeared. It is possible that some of the 167 who did not vote in the contested race intended to vote for "Howard Mead" and chose not to vote for anyone when that name did not appear on the ballot. It may even be that some or all of the 71 who voted for "Thomas Mead" would not have voted for "Howard Mead." It is precisely for this reason that we have held that the focus in an election contest involving illegal ballots is on whether they "exceeded . . . the margin of victory." *Howell v. Fears*, supra at 628. Thus,

> [i]t was not incumbent upon [Mead] to show how the [481] voters would have voted if their [absentee] ballots had been regular. He only had to show that there were enough irregu-lar ballots to place in doubt the result. He succeeded in that task.

(Footnote omitted.) *Howell v. Fears*, supra at 628.

Admittedly, *Fears* does contain the "in the contest being chal-lenged" language that appears in election contest cases involving illegal voters or the irregular recording of legal votes. Nevertheless, we certainly did not apply that principle there in the same literal fashion as the trial court did here. Had we done so, we simply would have held that no new election was necessary, because the 43 illegal ballots in *Fears* were not cast in the contested House race. Instead, this Court clearly recognized that, in an illegal ballot case, the comparison must be between the number of such ballots and the margin of victory. In *Fears*, 43 electors were denied their right to vote because of the illegality of the ballot, and a new election was ordered. In Laurens County, 481 voters were disenfranchised because they were given an absentee ballot which did not contain the names of all of those qualified candidates seeking to fill a seat on the Court of Appeals. The only relevancy of the 314 votes cast in the Court of

Appeals race is to reduce the total number of votes for each candidate, since they appear on illegal ballots and, therefore, are invalid votes.

> [T]he voter was entitled to understand that the ballot was legal as presented, and in thus voting it he acted upon a mistaken assumption, and this is enough to vitiate such ballots . . . . Nothing could possibly be more important than the sanctity of the ballot. It transcends in gravity far beyond any question as to who in any given case might be entitled to a particular office.

*Alexander v. Ryan*, supra at 583 (3). When 58 illegal votes are deducted from Sheffield's total of 207,473, the result is 207,415. Reducing Mead's total of 207,091 by 71 illegal votes leaves a balance of 207,020. The difference is a 395-vote lead for Sheffield. 481 is greater than 395. Therefore, we "have no hesitation in concluding that [Mead] satisfied [his] burden. After all, the number of irregular [absentee] ballots cast in [Laurens] County[ ] . . . exceeded [Sheffield's] margin of victory." *Howell v. Fears*, supra at 628.

The dissent states that the record shows that Mead was not prejudiced "by the misnomer." Dissent, p. 278. In support of that assertion, it compares the percentage of votes that Mead actually received statewide and in Laurens County with that which "Thomas Mead" received on the disputed absentee ballots. However, such a comparison is irrelevant. In this case, the only material comparison is between the actual number of Laurens County absentee ballots cast which failed to contain Mead's name and the number of votes by which Sheffield holds a lead over him. Under controlling authority, in order for Mead to prevail, the only prejudice that he was required to show was that the number of irregular ballots was sufficient to cast doubt upon the result of the election, and he has so shown. *Howell v. Fears*, supra at 628.

Moreover, the trial court did not, as the dissent indicates, term the ballots' irregularity a "misnomer." Dissent, p. 276. Instead, the trial court's order stated that the ballots bore Mead's "wrong first name." If the ballots had any name other than "Howard Mead," then they omitted the name of one of the qualified candidates for the office. See *Maye v. Pundt*, supra at 245 (1). The law of this state draws a distinction between a ballot which contains a mere misnomer or an irregularity as to form, and one which fails to provide the electorate with a choice between all of those candidates who have duly qualified to have their names appear thereon. Accordingly, the dissent erroneously relies on the trial court's expression of doubt as to the effect of

the ballots' irregularity, because such ballots are deemed illegal in Georgia as a matter of law. See *Alexander v. Ryan*, supra. See also *Howell v. Fears*, supra.

The dissent mistakenly states that, "under the majority's rationale, any omission, or even a misspelling of a name, would render a ballot illegal and require a new election if the number of ballots cast generally exceed the margin of victory." Dissent, p. 279. To the contrary, our holding today is exceedingly narrow. In the limited circumstance where *a ballot omits the name of a qualified candidate*, it is illegal and, if the number of those ballots exceeds the margin of victory, then *that illegality* requires that a new election be held so as to provide the voters with an opportunity to select from a complete slate of contenders for the position. This holding is neither a departure from nor an extension of Georgia election law. *Howell v. Fears*, supra; *Alexander v. Ryan*, supra.

The courts should be extremely hesitant to interfere with the electoral process. Mindful of that fact, we did not lightly decide to grant the stay of the contested Court of Appeals election. Having granted that stay only because of serious doubt as to the validity of the absentee ballots which failed to list all of the qualified candidates for the office, it is now incumbent upon us to resolve this election contest correctly for the benefit of the electorate of this state. For the reasons discussed, the trial court erred, because the 481 illegal absentee ballots in Laurens County exceed Sheffield's statewide lead over Mead and, as a consequence, the result of the election has been cast in doubt. Remaining reasons asserted as bases for affirming the trial court, including Mead's waiver of the ballots' illegality and the receipt by 105 of the absentee voters of oral notification of the absence of a qualified candidate's name, have been considered and found to be without merit.

OCGA § 21-2-527 (d) provides that,

> [w]henever the court trying a contest shall determine that the . . . election . . . is so defective as to the . . . office . . . as to place in doubt the result of the entire . . . election, . . . such court shall declare the . . . election . . . to be invalid with regard to such . . . office . . . and shall call for a second . . . election . . . to be conducted among all of the same candidates who participated in the . . . election . . . to fill such . . . office which was declared invalid and shall set the date for such second . . . election . . . .

Thus, the proper disposition of this appeal is a reversal of the judgment and a remand of the case to the trial court with direction that, in accordance with OCGA § 21-2-527 (d), it enter an order

requiring that a new statewide election be held to fill the seat on the Court of Appeals. *Howell v. Fears,* supra. In carrying out that direction, the trial court should act expeditiously in determining the specifics of how and when the new election should be held, giving consideration to such factors as the possible withdrawal of candidates and the duties imposed upon the Secretary of State in the implementation of the election process.

*Judgment reversed and case remanded with direction. Fletcher, C. J., and Hines, J., concur. Hunstein, J., concurs specially. Benham and Thompson, JJ., and Judge Neal W. Dickert dissent. Sears, P. J., not participating.*

HUNSTEIN, Justice, concurring specially.

I agree with the majority that the trial court's order must be reversed. *Howell v. Fears,* 275 Ga. 627 (571 SE2d 392) (2002) and the other cases relied on by the dissent have been perpetuating a misunderstanding in the law stemming from unfortunate language used in *Taggart v. Phillips,* 242 Ga. 454, 455 (249 SE2d 245) (1978). *Taggart* was an election case in which the contestor challenged the outcome of the election based both on the casting of votes by unqualified, i.e., "illegal," voters and on an irregularity in the ballot caused by misaligned voting machines. *Taggart* acknowledged those illegal voter cases that limited review of election cases to those votes recorded in a particular contest, noting that "to cast doubt on an election it is only necessary to show (1) that electors voted *in the particular contest being challenged* and (2) a sufficient number of them were not qualified to vote so as to cast doubt on the election. [Cit.]" Id. This limitation makes sense in "illegal voter" cases, given that if the unqualified voter did not vote in a particular contest the voter's unqualified status could have had no practical impact on the outcome of that contest. As to the irregular ballot issue, *Taggart* noted that "[s]imilarly, doubt may be cast on an election by showing improper maintenance of the voting machines resulting in votes being miscast. [Cit.]" Id. Unfortunately, the *Taggart* opinion then inartfully combined these two separate problems when it stated that the contestor "must show that a sufficient number of electors voted illegally or were irregularly recorded in the contest being challenged to change or cast doubt on the election."[1] This language has been cited in *Howell* and other cases for the proposition that the "contest being challenged" limitation applies to irregular ballot cases.[2] However,

---

[1] The more appropriate phrasing for that sentence would have been the contestor "must show that a sufficient number of electors *voted illegally in the contest being challenged* or were irregularly recorded to change or cast doubt on the election."

[2] While *Taggart* speaks in terms of "irregularly recorded" votes, *Howell* and other cases

unlike the illegal voter cases, application of this limitation makes no sense in a situation where the voters, all qualified, were issued irregular ballots by election officials. That is because we cannot know what effect the irregularity in the issued ballots had on the electors. The irregularity may be the very reason an elector declined to vote in that particular contest or chose not to vote at all. It may also be the reason an elector, confused by the irregularity, chose instead to cast a vote for another candidate in that contest. We do not know and should not surmise what an elector's intent may have been in irregular ballot cases, for we may well come to the wrong conclusion.[3] It is for this reason that I would disapprove *Howell v. Fears*, supra, *Bailey v. Colwell*, 263 Ga. 111 (428 SE2d 570) (1993) and any other case that indicates that only the votes cast in a particular contest may be considered in irregular ballot cases. In their stead I would hold that in an irregular ballot case, it is only necessary for a contestor to show that there were enough irregular ballots issued[4] to change or cast doubt on the election.

I agree with the majority that not all errors on a ballot rise to a level sufficient to render the issuance of the flawed ballot an "irregularity" on the part of a primary or election official under OCGA § 21-2-522 (1). Assessment of such errors must necessarily be handled on a case-by-case basis.[5] Furthermore, only those irregularities sufficient to change or place in doubt the result can serve to invalidate an election. Id. In this case I agree with the majority that the irregularity in the absentee ballots issued by Laurens County election officials was sufficient to place in doubt the result of the Court of Appeals contest. Thus, I agree with the majority that the trial court's judgment must be reversed and the case remanded with the direction

---

have expanded it to include any ballot irregularity. Hence, I would draw no distinction between irregular ballots and irregularly recorded votes.

[3] Thus I would also reject the alternate basis for the trial court's dismissal of Mead's petition, which involved subtracting the number of votes cast by electors for candidates other than Mead in the Court of Appeals contest from the total number of irregular ballots issued and concluding that the remaining votes failed to cast in doubt the outcome of the election. This reasoning likewise involves improper speculation regarding the intent of the electors.

[4] It follows that I must disagree with the majority that our consideration is limited to the 481 absentee ballots that were returned and counted. Instead I would include all absentee ballots that were issued because I consider it improper to speculate regarding the intent of those electors who failed to return the ballots or surmise that their decision was unrelated to the irregularity in the ballots.

[5] While this Court in the past has used "illegal ballot" to describe irregular ballots, see *Alexander v. Ryan*, 202 Ga. 578, 582 (3) (43 SE2d 654) (1947) (finding illegal certain ballots altered by rubber stamp to add name of candidate not qualified to be on ballot), the adverse impact of the ill-considered language in *Taggart* stands as an example why this Court should take care in following casual language in cases lacking a thorough analysis of the pertinent law.

that the trial court act expeditiously in accordance with OCGA § 21-2-527 (d).

THOMPSON, Justice, dissenting.

It has not been shown that the number of irregular ballots cast in this election contest exceeded the vote margin separating Sheffield and Mead. Accordingly, I respectfully dissent.

In this election case, six candidates[6] sought an open seat on the Court of Appeals of Georgia. After a non-partisan primary was held on July 20, 2004, it appeared that no candidate received more than 45 percent of the vote, and that the frontrunner, Debra Bernes, would face the second place finisher, Mike Sheffield, in a runoff election to be held on August 10, 2004. See OCGA § 21-2-501 (b). A recount yielded the same result. See OCGA § 21-2-495. Thereafter, the candidate who received the third highest number of votes, Howard Mead, filed suit to set aside the election results pursuant to OCGA § 21-2-522, on the ground that a number of official absentee ballots in Laurens County were issued improperly with the name "Thomas Mead," and that the irregularity was sufficient to place in doubt the result of the primary election.

It was established in an evidentiary hearing that, statewide, Sheffield received 382 more votes than Mead, and that 529 absentee ballots with the misnomer "Thomas" Mead were issued to voters in Laurens County. Of those, 481 were cast generally, and 314 were voted in the Court of Appeals race. "Thomas" Mead received 71 of the votes cast.

The trial court determined Mead failed to show that the number of defective absentee ballots exceeded the margin of votes between Sheffield and Mead. I would affirm that judgment.

> We must presume that the results of an election contest are valid. *Streeter v. Paschal*, 267 Ga. 207, 208 (476 SE2d 759) (1996). Thus, an election will not be invalidated unless the party contesting the election demonstrates an irregularity or illegality sufficient to change or place in doubt the result. Id.; *Bailey v. Colwell*, 263 Ga. 111 (428 SE2d 570) (1993). To carry that burden, the challenger must show a specific number of illegal or irregular ballots — and that number must be sufficient to cast doubt on the result of the election. *McCranie v. Mullis*, 267 Ga. 416 (478 SE2d 377) (1996). Accord *Hunt v. Crawford*, 270 Ga. 7 (507 SE2d 723) (1998). Accord *Taggart v.*

---

[6] The candidates were Debra Bernes, William Ashley Hawkins, Howard Mead, Thomas C. Rawlings, Mike Sheffield, and Lee Elizabeth Tarte Wallace.

*Phillips*, 242 Ga. 454 (249 SE2d 245) (1978). It is not sufficient to show irregularities which simply erode confidence in the outcome of the election. Elections cannot be overturned on the basis of mere speculation, *Hunt,* supra at 9, or an appearance of impropriety in the election procedures. Compare *Stiles v. Earnest,* 252 Ga. 260, 263 (312 SE2d 337) (1984).

*Middleton v. Smith*, 273 Ga. 202, 203 (539 SE2d 163) (2000).

In *Howell v. Fears*, 275 Ga. 627 (571 SE2d 392) (2002), 2,660 voters in three counties cast ballots in a race to determine the Democratic nominee for State Representative in House District 92. Howell and Fears were the only candidates in that race and Howell defeated Fears by a margin of 34 votes. When it was discovered that 43 registered voters in Precinct 9 of Spalding County cast ballots which made no mention of the House District 92 race, Fears contested the election results. The superior court invalidated the election and Howell appealed. Citing *Taggart v. Phillips,* supra, and *Miller v. Kilpatrick,* 140 Ga. App. 193 (230 SE2d 328) (1976), this Court held that in order to prevail in an election contest, "the contestor must affirmatively show that a sufficient number of voters voted illegally or were irregularly recorded *in the contest being challenged* to make a difference or cast doubt on the outcome." (Emphasis supplied.) *Howell,* supra at 627-628. Because Fears demonstrated that the number of irregular ballots cast in Precinct 9 exceeded the margin of victory, we affirmed the judgment of the superior court. Our decision flowed naturally from *Taggart v. Phillips,* supra, in which this Court observed:

> [T]o cast doubt on an election it is only necessary to show (1) that electors voted *in the particular contest being challenged* and (2) a sufficient number of them were not qualified to vote so as to cast doubt on the election. [Cit.] . . . Appellant must show that a sufficient number of electors voted illegally or were irregularly recorded in the contest being challenged to change or cast doubt on the election. It is not for whom they voted but that they voted in this "race" illegally or the votes were irregularly recorded.

Id. at 455. Accord *Taggart v. Phillips,* 242 Ga. 484 (249 SE2d 268) (1978).

Similarly, in *Bailey v. Colwell,* supra, Bailey and Colwell were candidates in the general election for the Seventh District House of Representatives seat. Colwell won the election by 101 votes and Bailey contested the result. The evidence demonstrated that 131

absentee ballots were not properly cast in the general election, and that 409 electors did not vote for either candidate. Nevertheless, the superior court ruled for Colwell because Bailey failed to cast doubt on the outcome of the particular race in question. Looking to *Taggart v. Phillips*, 242 Ga. 454, supra, we affirmed, holding that "while [Bailey] established that 131 absentee ballots were not properly cast, he did not establish that any of the improper absentee ballots were cast in the Bailey-Colwell race." *Bailey*, supra at 112.

Thus, we have consistently held that we must look to the votes cast in the *particular contest being challenged* to determine whether the results of that race are in doubt. See, e.g., *McCranie v. Mullis*, 267 Ga. 416 (478 SE2d 377) (1996). Because the number of votes cast in the Court of Appeals race (314) is less than the margin of votes between Sheffield and Mead (382), I believe our precedent demands that the election be upheld. By looking to the number of irregular ballots cast generally, instead of the ballots voted in the Court of Appeals race, the majority departs from this precedent.

The majority justifies its departure from precedent because the name "Howard Mead" did not appear on the absentee ballots. In this regard, the majority concludes that the misnomer — "Thomas Mead" — rendered the ballots a nullity. The problem with the majority's conclusion is two-fold. First, the record contains no evidence that Mead was prejudiced by the misnomer.[7] Second, it flies in the face of the superior court's determination that "it is doubtful this [misnomer] would have changed or placed in doubt the outcome." See in this connection *Thacker v. Morris*, 196 Ga. 167, 174 (26 SE2d 329) (1943) ("while it might have been better to follow the statute in the submission of the question to the voters, it is not considered that the form in which it was submitted was so confusing as to mislead the voters or to cause them to cast their votes contrary to their intention").

> When considering a petition alleging a violation in the form of the ballot, "a vital consideration guiding the courts in determining whether an election should be voided is the reluctance to reach a decision which would result in the disenfranchisement of the voters. Indeed, as regards defects in ballots, the courts have generally declined to void an election unless such defects clearly operate to prevent that free, fair and open choice." [Cit.]

---

[7] In fact, the evidence is otherwise. The record reveals that Mead was credited with 22.6 percent of the "Thomas Mead" absentee ballots cast in Laurens County, and that he received 22.6 percent of the "Howard Mead" ballots cast at Laurens County polling places. It also shows that Mead received 19.8 percent of all ballots cast statewide.

*Fladell v. Palm Beach County Canvassing Board*, 772 S2d 1240, 1242 (Fla. 2000). Without sufficient evidence, and a proper determination by the superior court, that the absentee ballots in this case were so defective as to cast doubt on the Court of Appeals race, this Court should not interfere with the results rendered in that contest.

The majority professes to have rendered an opinion which is "exceedingly narrow." But under the majority's rationale, any omission, or even misspelling of a name, would render a ballot illegal and require a new election if the number of ballots cast generally exceed the margin of victory. This goes too far because it deprives a reviewing court of the discretion to evaluate whether a ballot is so defective as to place the results of the election in doubt. Therefore, I respectfully dissent.

I am authorized to state that Justice Benham and Judge Neal W. Dickert join in this dissent.

DECIDED SEPTEMBER 2, 2004.

*Marc B. Hershovitz, Charles W. Byrd*, for appellant.
*Nancy I. Jordan, King & Spalding, Michael C. Russ, John S. Darden, Bentley, Bentley & Bentley, Fred D. Bentley, Jr., Wasson, Sours & Harris, John D. Sours, Andrea L. May, Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, Stefan E. Ritter, Senior Assistant Attorney General*, for appellees.
*W. Ashley Hawkins*, pro se.
*Thomas C. Rawlings*, pro se.
*Lee Tarte Wallace*, pro se.