A06A1409, A06A1410. AMBLING MANAGEMENT COMPANY v. PURDY; and vice versa.
(640 SE2d 620)

PHIPPS, Judge.

Maria Purdy sued Ambling Management Company, the leasing agent and property manager of her apartment complex, alleging that its negligent maintenance of her apartment caused her personal injury and property damage. Purdy sought compensatory and punitive damages. At trial, Ambling moved for a directed verdict on

numerous grounds; the court granted the motion on the claim for punitive damages, denying it in all other respects; and the jury found in Purdy's favor. The court entered judgment upon the jury's verdict. In Case No. A06A1409, Ambling challenges the trial court's denial of its motion for a directed verdict on certain grounds. In Case No. A06A1410, Purdy challenges the trial court's grant of Ambling's motion for a directed verdict on her claim for punitive damages. For reasons that follow, we affirm the trial court's judgment in both cases.

In April 1998, Purdy was the first tenant to move into her particular unit within the complex. Within months, she noticed that a black substance had accumulated on surfaces throughout the apartment. She immediately reported the problem to Ambling's property manager, who visited the apartment and told Purdy that the substance was possibly "soot from somewhere." In April 1999, Purdy renewed her lease, but continued to complain about the worsening accumulation to the property manager, as she later did to about four subsequent property managers for Ambling. Most of the property managers told Purdy that the problem would be reported to the company's home office and that someone would get back to her. Purdy testified, "we thought it was mildew," and "we just kept dealing with the mildew problem or the water problems." Purdy also asked Ambling to change air filters for the heating and air conditioning systems about every six months, which it did.

Meanwhile, around the "first of 2000," Purdy became concerned that the black substance was something other than mildew and that it was adversely affecting her health because she was experiencing respiratory problems, i.e., "a lot of congestion, a lot of sputum, a lot of deep wheezing and coughing, and things of that nature." After renewing her lease in April, she began in May to take steps herself to ascertain the content and origin of the substance. She summoned an assistant fire marshal to her apartment to investigate its "sooty" condition, as well as her heating unit. Noting from the outside of the unit that it was not gas, but electric, he instantly excluded it as a contributing factor. Instead, he attributed the soot accumulation to numerous candles placed throughout the apartment. Purdy next took an air filter from her apartment for testing by the county extension office, but that office had no explanation for her problem.

In January 2001, Purdy hired a chemist, Augusto S. Medina, Ph.D., to determine the content and source of the substance. She told him during his investigation that she had been the first tenant in the apartment and that soon after she moved in, "black smudges" formed on surfaces throughout the apartment. Purdy showed Medina that the walls, the carpet, her clothing, the insides of her cupboards, and various other items and locations were all coated by black particles. Medina spent about three hours at the apartment, during which time

he particularly noted "streaks of black smudges coming from" the heating and air conditioning vents. He informed Purdy, "[I]t's coming from your HVAC." Examining the inside of the heating unit, Medina discovered "quite a bit of black soot in there" from which he took samples. He also took samples from the "thick wad" of black material he found inside a small gadget that Purdy had been using to filter air in her apartment.

Back at his lab, Medina analyzed the collected samples, finding burned particles containing polyvinyl acetate (PVA). According to Medina, PVA is a common paint ingredient. In a January 22, 2001 report to Purdy, Medina concluded, "The black smudges consist of residues of [PVA]," and further, "The black smudges came from a paint source, probably from the time the apartment was constructed paint fumes collected in the HVAC system and eventually burned in the heating system." He testified that this was "the most probable scenario."

Purdy gave a copy of Medina's report to Ambling's property manager and announced she planned to move. Ambling responded in late January 2001 by offering her another apartment in the same building. Concerned that the offered apartment would present the same problem, Purdy moved out of the complex in March 2001.

Purdy testified, "At the time [I was moving] I was having a lot of respiratory problems. . . . And during this time we had found a knot in my throat — in my neck." In April 2001, she underwent surgery to remove the mass, which was determined to be a lymph node with Langerhans Cell Histiocytosis (LCH).

Purdy sought advice from Drs. Fredric Gerr and Michael Atta of the Environmental and Occupational Medicine Consultation Clinic of the Emory Clinic to determine whether the residue in the apartment had caused her respiratory and LCH problems. In a September 2001 report to Purdy, the physicians found the temporal relationship between her respiratory symptoms and her approximately three-year residence in an apartment with "sooty" coated walls "suggestive" of effects of exposure to a hazard in the apartment, but also noted that Purdy had been a "heavy cigarette smoker, a known cause of respiratory symptoms." Gerr and Atta concluded, "[I]t is not possible to state that anything related to the apartment was responsible for her [LCH]."

Purdy next consulted Dr. Allen Lieberman, an occupational and environmental physician, to determine whether there was a connection between PVA and her respiratory and LCH conditions. Over a two-day period, Lieberman took Purdy's case history and physically examined her. In a May 2002 medical report, he concluded that "the node can be unequivocally related to PVA" and that "it is also logical that chronic exposure to airborne pollutants could unequivocally

result in respiratory injury and immune suppression resulting in the history of chronic sinusitis and cough." Lieberman stated in a subsequent medical report concerning Purdy's respiratory and LCH conditions,

> [T]here are no other reasonable explanations to account for her upper airway injury and distress. . . . It is also more logical to conclude on the basis of temporality that whatever was causing the upper airway disturbance was also causing the proliferation of the submental lymph node. . . . It is therefore more certain than not that her body was reacting to the presence of the [PVA]. . . .

In June 2002, Purdy sued Ambling.

## Case No. A06A1409

OCGA § 9-11-50 (a) provides in pertinent part that "(i)f there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict, such verdict shall be directed." In determining whether any conflict in the evidence exists, the court must construe the evidence most favorably to the party opposing the motion for directed verdict. The standard used to review the grant or denial of a directed verdict is the "any evidence" test.[1]

1. Ambling contends that the trial court erred by denying its motion for a directed verdict on the ground that Purdy's personal injury claim was precluded by the two-year statute of limitation set forth in OCGA § 9-3-33. That Code section pertinently provides, "Actions for injuries to the person shall be brought within two years after the right of action accrues."[2]

Ambling relies upon *Thomason v. Gold Kist.*[3] In that case, certain family members sued Gold Kist, alleging that it had sold one of them the toxic pesticide Chlordane Emulsifiable Concentrate ("Chlordane") for the wrongful purpose of killing roaches inside their house and that, upon such use, they had suffered personal injuries, among other things.[4] The trial court granted Gold Kist summary judgment, finding that the plaintiffs had failed to timely file suit under the

---

[1] *Skelton v. Skelton*, 251 Ga. 631, 633 (4) (308 SE2d 838) (1983) (citations omitted).
[2] OCGA § 9-3-33.
[3] 200 Ga. App. 246 (407 SE2d 472) (1991).
[4] Id.

two-year statute of limitation within OCGA § 9-3-33. On appeal, these plaintiffs maintained that the two-year limitation period under that Code section did not begin to run against them until they were diagnosed with symptoms consistent with Chlordane poisoning, which was about seven months prior to the filing of their action.[5] We cited the oft-quoted rule: "A cause of action will not accrue under the discovery rule until the plaintiff discovers or in the exercise of reasonable diligence should have discovered not only that he has been injured but also that his injury may have been caused by the defendant's conduct."[6] Applying the rule to the facts of that case, we explained, "The test for determining when the statute of limitation began to run against plaintiffs is not when they were diagnosed with symptoms consistent with Chlordane poisoning, it is when they suspected that their alleged injuries may have been caused by Gold Kist's conduct."[7] Because unrebutted evidence showed that these plaintiffs had suspected that Chlordane was the cause of their alleged injuries more than two years before they filed suit, we affirmed the trial court's ruling that their personal injury claims were barred by the two-year limitation period of OCGA § 9-3-33.[8]

Ambling asserts that the evidence in this case showed that Purdy was concerned that the black substance was already adversely affecting her health when she renewed her lease in April 2000. It claims that the evidence further showed that, out of this concern, Purdy initiated self-help measures in May 2000. It argues that Purdy's cause of action accrued in April or May 2000 and that because she did not file a lawsuit until June 2002, her case is time-barred.

We find Ambling's contention without merit, even assuming without deciding that Purdy's cause of action accrued in April or May 2000. Ambling's reliance upon *Thomason* overlooks a critical distinction between that case and this one. Unlike in *Thomason*, the continuing tort theory operated here to *toll* the running of the statute of limitation to within two years of commencement of the action.

As the Supreme Court of Georgia has explained, the theory of continuing tort applies "where any negligent or tortious act is of a continuing nature and produces injury in varying degrees over a period of time."[9] Where there is a breach of a duty owed to another and

---

[5] Id. at 247 (1).

[6] Id. (citations and punctuation omitted); see further *Corp. of Mercer Univ. v. Nat. Gypsum Co.*, 258 Ga. 365, 366 (1) (368 SE2d 732) (1988) (discovery rule applies to cases of bodily injury that develop over an extended period of time).

[7] *Thomason*, supra at 247 (citations and punctuation omitted).

[8] Id. at 249.

[9] *Everhart v. Rich's, Inc.*, 229 Ga. 798, 802 (2) (194 SE2d 425) (1972); see *Mears v. Gulfstream Aerospace Corp.*, 225 Ga. App. 636, 640 (2) (a) (484 SE2d 659) (1997); see also *Corp.*

the cumulative effects of continued exposure result in injury, a cause of action accrues when exposure to the hazard first produces ascertainable injury.[10]

> While the tort is then complete in the sense that it will support a claim, it is nevertheless a tort of a continuing nature which *tolls the statute of limitation so long as the continued exposure to the hazard is occasioned by the continued failure of the tortfeasor to warn the victim,* and the statute of limitation does not commence to run under these circumstances until such time as the continued tortious act producing injury is eliminated, e.g., by an appropriate warning in respect to the hazard.[11]

We conclude that the continuing tort theory applies here such that the statute of limitation did not begin to run against Purdy until the exposure was eliminated, i.e., either Purdy removed herself from exposure to the hazard or Ambling took some measure to abate the contamination, warn Purdy of the hazard, or remove her from it.[12] Because there was evidence that Purdy's exposure to the hazard was not eliminated more than two years before suit was filed, the trial court did not err in denying Ambling's motion for directed verdict on the ground that Purdy's personal injury claim was precluded by OCGA § 9-3-33.[13]

2. Ambling contends that the trial court erred by failing to exclude Medina's and Lieberman's expert opinions, arguing that the evidence was inadmissible under OCGA § 24-9-67.1. But Ambling failed to assert this argument so as to seek a timely ruling under subsection (d) of that Code section. Under *Bailey v. Edmundson,*[14] a challenge to expert evidence on the ground that it fails to satisfy the requirements of OCGA § 24-9-67.1, any hearing pertaining to such challenge, and the ruling thereon, " 'shall be completed no later than the final pretrial conference contemplated under (OCGA §) 9-11-16.' "[15]

---

*of Mercer Univ.,* supra at 366 (2) (limiting continuing tort theory expressed in *Everhart,* supra, to cases in which personal injury is involved).

[10] *Everhart,* supra.

[11] Id. (emphasis supplied).

[12] See id.; *Mears,* supra; see generally *Smith v. Branch,* 226 Ga. App. 626, 629 (2) (c) (487 SE2d 35) (1997).

[13] See *Everhart,* supra; *Mears,* supra; compare *Thomason,* supra (no showing that continuing tort theory operated to toll the statute of limitation within two years of date suit was filed); *King v. Seitzingers, Inc.,* 160 Ga. App. 318 (287 SE2d 252) (1981) (same).

[14] 280 Ga. 528 (630 SE2d 396) (2006).

[15] Id. at 533 (5), quoting OCGA § 24-9-67.1 (d).

No transcript of a pretrial conference is in the record before us. However, the record reveals that, in the complaint, which was served upon Ambling in June 2002, Purdy named Medina as the person who had analyzed samples of the black dust from her apartment and determined that it contained PVA. Therein, she also named Lieberman as the doctor who had examined her and advised her that the PVA had caused her alleged personal injury. Purdy further attached to the complaint Lieberman's curriculum vitae and May 2002 medical report; and she expressly alerted Ambling in the complaint that she intended to tender these documents in evidence at trial pursuant to OCGA § 24-3-18.[16] With respect to Lieberman's subsequent medical report, the record confirms that Ambling received it about six weeks prior to entry of the pretrial order. On October 20, 2005, Purdy's counsel took Medina's deposition for trial evidence, anticipating Medina's unavailability for trial. Ambling's counsel was present, but asserted no OCGA § 24-9-67.1 objection. About a week thereafter, the pretrial order signed by counsel for each party was filed. It listed Medina's deposition testimony as evidence Purdy might introduce and further listed Lieberman's curriculum vitae and medical reports as evidence Purdy would tender. In the pretrial order, Ambling purported to "reserve all objections" to the admissibility of evidence. On the Friday preceding the Monday for trial, Ambling filed motions to exclude Medina's and Lieberman's opinions as inadmissible under OCGA § 24-9-67.1.

Because Ambling failed to timely challenge the expert evidence under OCGA § 24-9-67.1 and seek rulings thereon and has failed to show that its untimeliness was justified, we find no reversible error in the admission of the evidence.[17] As the trial court recognized, had "[Ambling] wanted to file a [OCGA § 24-9-67.1] motion earlier, [it] could have, and not on the [last workday before] trial."

---

[16] OCGA § 24-3-18 (a) pertinently provides:

Upon the trial of any civil case involving injury or disease, any medical report in narrative form which has been signed and dated by an examining or treating licensed medical doctor . . . shall be admissible and received in evidence insofar as it purports to represent the history, examination, diagnosis, treatment, prognosis, or interpretation of tests or examinations, including the basis therefor, by the person signing the report, the same as if that person were present at trial and testifying as a witness; provided, however, that such report and notice of intention to introduce such report must first be provided to the adverse party at least 60 days prior to trial. A statement of the qualifications of the person signing the report may be included as part of the basis for providing the information contained therein, and the opinion of the person signing the report with regard to the etiology of the injury or disease may be included as part of the diagnosis.

[17] See *Bailey*, supra; *Mead v. Sheffield*, 278 Ga. 268, 269 (601 SE2d 99) (2004) (instructing that the word "shall" is generally construed as a word of command).

3. Ambling contends that the trial court erred by denying its motion for a directed verdict on the ground that Purdy had failed to prove that it had caused the soot to appear throughout her apart-ment.[18] It cites evidence that during the time Purdy lived there, she smoked up to one and one-half packs of cigarettes each day and burned candles in her home. It also cites evidence that Purdy herself painted walls in the apartment in November 2000, two months before Medina inspected it.

Notwithstanding that evidence, Purdy's theory that the accumulation of the black substance throughout her apartment was due to Ambling's negligent maintenance was substantiated partly by Medina's testimony.[19] He found such theory as "the most probable scenario." Moreover, there was evidence that the residue problem began long before Purdy painted walls in November 2000. Purdy explained at trial that the walls were "so dirty" by then that she resorted to painting them because her prior attempts to clean them had only smeared the particles. Purdy also testified that after moving to another residence, she continued to smoke and burn candles inside, but experienced no residue problems there.

Construed to favor Purdy, the evidence did not mandate granting Ambling's motion on this ground.

4. Ambling contends that the trial court erred by denying its motion for a directed verdict on the ground that Purdy had failed to show that her exposure to burned particles of PVA had caused her LCH condition. Ambling points to Atta and Gerr's report finding no causal link between the two. Ambling also cites the testimony of its own medical expert witness, Dr. Stephen Schacher, an occupational medicine physician, who examined Purdy's medical records, researched whether there was any link between PVA and Purdy's alleged personal injury, and concluded that "there has never been a reported case of [PVA] toxicity of any kind." He reported that he "could not find a single case in the world's literature of . . . anyone claiming that they were injured by it." Schacher opined that there was no connection between exposure to PVA and the development of LCH, disapproving of Lieberman's use of a particular article to reach his opinion otherwise. In addition, Ambling argues that Lieberman's

[18] See *Atlanta Obstetrics & Gynecology Group v. Coleman*, 260 Ga. 569 (398 SE2d 16) (1990) (plaintiff in a negligence action must prove that the defendant's conduct was both the "cause in fact" and the "proximate cause" of the injury).

[19] See generally *Daniel v. Parkins*, 200 Ga. App. 710, 711 (2) (409 SE2d 233) (1991) (in response to a hypothetical question, an expert may assume facts not within his personal knowledge, if the assumed facts are placed in evidence by the testimony of other witnesses or by other legal means).

opinion was insufficient under *Zwiren v. Thompson*,[20] asserting that it was not stated in terms of "a reasonable degree of medical probability."

In *Zwiren*, the Supreme Court of Georgia reasoned that "if the plaintiff's medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment."[21] The Court determined:

> "[R]easonable degree of medical certainty," while an *acceptable* means by which an expert may express the confidence the expert has in the conclusion formed and the probability that it is accurate, is not the *required* standard. Georgia case law requires only that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i.e., reasonable medical probability or reasonable medical certainty.[22]

Assuming without deciding that *Zwiren*, a medical malpractice case,[23] applies to premises liability cases, we find Ambling's contention without merit. Lieberman's opinion,[24] construed to favor Purdy, met the threshold showing required by that case. And in light of this evidence, the trial court properly denied Ambling's motion for a directed verdict on this ground, notwithstanding inconsistent or even contradictory evidence.

5. Ambling contends that the trial court erred by denying its motion for a directed verdict on the ground that Purdy's own conduct barred recovery because she failed to exercise ordinary care for her personal safety and that she assumed the risk of being exposed to a hazardous condition. Ambling asserts that, with knowledge that an unidentified substance was accumulating within her apartment, Purdy twice renewed her lease and later refused to respond to Ambling's offer of a new apartment.

(a) To recover in a premises liability case, a plaintiff is required to prove, among other things, that "[she] lacked knowledge of the

---

[20] 276 Ga. 498 (578 SE2d 862) (2003).

[21] Id. at 501 (citations and punctuation omitted).

[22] Id. at 503.

[23] See id. at 498-504.

[24] Lieberman's opinion was contained in his medical reports, which included his curriculum vitae and were received in evidence under OCGA § 24-3-18. See OCGA § 24-3-18 (b) ("medical narrative shall be presented to the jury as depositions are presented to the jury").

hazard despite the exercise of ordinary care due to actions or conditions within the control of the owner/occupier."[25] In ruling on whether a plaintiff has made that showing, a trial court is required to take into account all the circumstances that existed during the pertinent time.[26] Generally, whether the plaintiff failed to exercise ordinary care for her personal safety is not susceptible of judgment as a matter of law.[27]

Evidence showed that immediately upon noticing a black substance coating surfaces within her apartment, Purdy notified Ambling's property manager and that she continued to complain to Ambling's property managers about the problem throughout her stay there. Several property managers promised Purdy that Ambling would respond to her problem, which promises might have diverted her focus from the hazard.[28] But because Ambling did not stop the buildup, Purdy took it upon herself to determine its content and source. Through her efforts, Purdy learned that burned particles containing PVA were being emitted from the heating unit. She promptly announced to Ambling her plan to move from the complex. Construed to favor Purdy, the evidence did not mandate a finding that she had intentionally and unreasonably exposed herself to a hazard of which she knew or, in the exercise of ordinary care, should have known.

(b) Nor did the evidence mandate a finding that recovery was barred because Purdy had assumed the risk of the hazard.

> In Georgia, a defendant asserting an assumption of the risk defense must establish that the plaintiff (1) had actual knowledge of the danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed himself to those risks. Knowledge of the risk is the watchword of assumption of risk, and means both *actual* and *subjective* knowledge on the plaintiff's part. The knowledge that a plaintiff who assumes a risk must subjectively possess is that of the specific, particular risk of harm associated with the activity or condition that proximately causes injury. The

---

[25] *Robinson v. Kroger Co.*, 268 Ga. 735, 749 (2) (b) (493 SE2d 403) (1997).

[26] Id. at 748.

[27] Id.

[28] See id. (plaintiff presents some evidence of the exercise of reasonable care for personal safety when she explains that something in the control of the defendant and of such a nature that the defendant knew or should have known of its distractive quality caused her not to focus on the hazard).

knowledge requirement does not refer to a plaintiff's comprehension of general, non-specific risks that might be associated with such conditions or activities. . . . In its simplest and primary sense, assumption of the risk means that the plaintiff, in advance, has given his consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from *a known risk arising from what the defendant is to do or leave undone.*[29]

Here, there was evidence that, until she received Medina's report weeks before she moved away from the apartment complex, Purdy did not have actual knowledge of the danger and did not know of the specific, particular risk of harm associated with conditions within her apartment.[30]

Thus, the trial court correctly denied Ambling's motion for a directed verdict on the ground that Purdy's own conduct barred recovery.

### Case No. A06A1410

6. As an initial matter in this case, we consider Ambling's jurisdictional challenge to Purdy's cross-appeal. OCGA § 5-6-38 (a) pertinently provides, "In civil cases, the appellee may institute cross appeal by filing notice thereof within 15 days from service of the notice of appeal by the appellant; and the appellee may present for adjudication on the cross appeal all errors of rulings adversely affecting him."

The record confirms that, within 15 days of being served with Ambling's notice of appeal, Purdy filed a notice of cross-appeal, stating that she was appealing from the trial court's grant of a directed verdict in favor of Ambling on the issue of punitive damages. That is her sole claim of error on cross-appeal. We conclude that Purdy properly instituted this cross-appeal.[31]

7. Purdy contends that the trial court erred in directing a verdict against her on her claim for punitive damages under OCGA § 51-12-5.1 (b). This Code provision authorizes punitive damages

---

[29] *Vaughn v. Pleasent*, 266 Ga. 862, 864 (1) (471 SE2d 866) (1996) (punctuation and footnotes omitted); see *FPI Atlanta, L.P. v. Seaton*, 240 Ga. App. 880, 885 (3) (524 SE2d 524) (1999).

[30] See *Vaughn*, supra; *FPI Atlanta, L.P.*, supra.

[31] See *Felix v. State*, 271 Ga. 534, 538 (523 SE2d 1) (1999) (where it is apparent from the notice of appeal, the record, the enumeration of errors, or any combination of the foregoing, what errors are sought to be asserted upon appeal, an appellate court is required to consider the appeal); *Nager v. Lad 'N Dad Slacks*, 148 Ga. App. 401, 402-403 (2) (251 SE2d 330) (1978); *Johnson v. Daniel*, 135 Ga. App. 926, 926-927 (1) (219 SE2d 579) (1975).

only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.[32]

In reviewing a motion for directed verdict, the trial and appellate courts have the same basic task: each must determine as a matter of law whether the evidence was sufficient under the clear and convincing standard.[33] "[C]lear and convincing evidence is an intermediate standard of proof, requiring a higher minimum level of proof than the preponderance of the evidence standard, but less than that required for proof beyond a reasonable doubt."[34]

Purdy asserts that, despite her numerous complaints, Ambling did nothing to identify the black material settling throughout her apartment, discover its source, or determine whether it presented a danger to her health. She argues that Ambling's prolonged inaction evinced a conscious indifference to consequences. Ambling counters that Purdy presented a case, at most, for simple negligence. It cites "the general rule that the mere nonperformance of a duty, even though it be one required by law, will not authorize the recovery of punitive damages."[35]

We agree with the trial court that Purdy failed to present clear and convincing evidence authorizing the imposition of punitive damages.

Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton. There is general agreement that, because it lacks

---

[32] OCGA § 51-12-5.1 (b).

[33] *Uniroyal Goodrich Tire Co. v. Ford*, 218 Ga. App. 248, 255, n. 2 (461 SE2d 877) (1995) (the appellate court will not defer to the trial judge's determination if there is any evidence "whatsoever" to support it; rather, the issue on appeal remains whether there is any evidence sufficient "under the clear and convincing standard"), rev'd on other grounds, *Ford v. Uniroyal Goodrich Tire Co.*, 267 Ga. 226 (476 SE2d 565) (1996).

[34] *Clarke v. Cotton*, 263 Ga. 861, 862, n. 1 (440 SE2d 165) (1994) (citations and punctuation omitted).

[35] *Kaplan v. Sanders*, 237 Ga. 132, 133-134 (1) (227 SE2d 38) (1976) (citations omitted).

this element, mere negligence is not enough, even though it is so extreme in degree as to be characterized as gross. . . .[36]

Purdy's own testimony reveals that her repeated complaints to Ambling were about a supposed mildew problem in her apartment; that she had been dealing with the condition as a mildew problem; and that within about a week of receiving Purdy's complaint that the contamination was something other than mildew, Ambling offered her another apartment. While the jury was nevertheless authorized to find that Ambling, all along, had constructive knowledge that the contamination was instead comprised of burned particles containing PVA and yet negligently failed to correct the problem, there is no clear and convincing evidence that Ambling knew or should have known that prolonged exposure to these particles would cause the personal injury for which Purdy sought recovery. There was uncontroverted evidence that never before had there been a report of any person claiming to have been injured by prolonged PVA exposure. And a source upon which Lieberman relied in opining that Purdy had been so injured was attacked as irrelevant by other expert medical testimony.

Under this record, there is not clear and convincing evidence that Ambling demonstrated a conscious indifference to consequences so as to authorize the imposition of punitive damages.[37] Accordingly, we

---

[36] *Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 121-122 (4) (365 SE2d 827) (1988) (citation and punctuation omitted).

[37] See *Trotter v. Summerour*, 273 Ga. App. 263, 264-266 (1) (614 SE2d 887) (2005) (award of punitive damages was not authorized to plaintiff injured when metal tongue welded to frame of house trailer broke from trailer and caused the trailer to fall on him as he was working underneath the trailer, where the defendant had negligently welded the tongue onto the trailer frame, but did not know that the tongue would be used for anything other than pulling the trailer); *Uniroyal Goodrich*, supra at 254-255 (3) (b) (imposition of punitive damages was not authorized against manufacturer of the tire used on van involved in car wreck, where manufacturer had complied with applicable regulations in designing tire and no evidence showed that the type of tire had ever before caused an injury); compare *Gen. Motors Corp. v. Moseley*, 213 Ga. App. 875, 884-885 (8) (a) (447 SE2d 302) (1994) (where evidence showed that vehicle manufacturer was aware of the problems inherent with placement of fuel tanks outside the frame on its full-size pickup trucks, which exposure could have been significantly reduced by application of a steel shield around the tank, or by using retaining straps with rounded edges, yet it did not implement such modifications because of economic considerations, such evidence of a knowing endangerment of all who may come in contact with one of the five million full-size pickup trucks still on the road, was sufficient to support an award of punitive damages); *McWilliams v. Hayes*, 190 Ga. App. 709, 709-710 (1) (379 SE2d 528) (1989) (where evidence showed that landlord knew or should have known that the plaintiff's alleged injuries would result from the manner in which it negligently maintained the premises, award of punitive damages was authorized); *Crow v. Evans*, 183 Ga. App. 581, 583 (2) (359 SE2d 446) (1987) (imposition of punitive damages against landlord for injuries sustained by plaintiff when bathroom floor next to tub in apartment collapsed was authorized, where evidence showed that landlord had been aware for several years of "serious problems with the plumbing" in plaintiff's apartment and in three contiguous apartments, and where landlord was further aware that

34

find no error in the trial court's grant of Ambling's motion for a directed verdict on Purdy's claim for punitive damages.

*Judgment affirmed. Ruffin, C. J., and Smith, P. J., concur.*

DECIDED NOVEMBER 28, 2006 —
RECONSIDERATION DENIED DECEMBER 15, 2006 — 

*Fields, Howell, Athans & McLaughlin, Michael J. Athans, Gregory O. Shenton,* for appellant.
*Wm. Benjamin Ballenger, Sanford M. Hill,* for appellee.

another tenant had fallen through a bathroom floor because of similar plumbing problems).