### S13A0517. MEADE v. WILLIAMSON.
(745 SE2d 279)

BENHAM, Justice.

Appellant Dana Meade and Appellee Tim Williamson were the candidates on the ballot in a run-off election in the Democratic primary for Sheriff of Baker County.[1] Meade is the incumbent in the race and was, at the time of the election, serving as Sheriff. The election was held on August 21, 2012. A total of 1,353 votes were cast in the race and Meade was declared the winner by a margin of 39 votes. Williamson timely filed a petition in the Superior Court of Baker County contesting the results of the election. After a bench trial, the trial court issued an order setting forth findings of fact and reaching the conclusion that sufficient irregularities in voting and in the election process were shown to cast doubt upon the election result. The election was declared invalid, and a new election was ordered.[2]

---

[1] Because no candidate qualified to run in the Republican primary, the election in question in this case is determinative of who will be elected to the office.

[2] The original order required the new run-off election to be held on November 6, 2012, but the order was amended to stay the date of the new election to within 60 days of remittitur from this Court in the event of an appeal.

"It is presumed that election returns are valid, and the party contesting the election has the burden of showing an irregularity or illegality sufficient to change or place in doubt the result of the election." *Banker v. Cole*, 278 Ga. 532, 535 (4) (604 SE2d 165) (2004) (citation and punctuation omitted). On the other hand, "a trial court's findings in an election contest will not be disturbed unless clearly erroneous." Id. at 533 (1) (citation and punctuation omitted). Based upon this Court's review of the evidence presented at the bench trial, we find the contestant in this case did not meet the evidentiary burden and that the trial court committed factual and legal errors in its ruling. This Court has set aside elections under two different circumstances. In the majority of cases in which this Court has affirmed an order setting aside an election, we have required the evidence to "show that a sufficient number of electors voted illegally or were irregularly recorded in the contest being challenged to change or cast doubt on the election." *McCranie v. Mullis*, 267 Ga. 416 (478 SE2d 377) (1996).[3] This Court has also recognized that the result of an election may be voided where systemic irregularities in the process of the election are sufficiently egregious to cast doubt on the result. See *Stiles v. Earnest*, 252 Ga. 260 (3) (312 SE2d 337) (1984). The evidence presented at trial meets neither of these standards. The evidence failed to establish a sufficient number of specific irregular or illegal ballots that would change or place in doubt the results of the election. Further, this Court rejects the trial court's finding that sufficient irregularities in the election process were shown to cast doubt upon the results. Accordingly, we reverse the order invalidating the August 21, 2012 run-off election in the Democratic primary for Sheriff of Baker County.

The trial court based its order upon the following findings: (1) there had been vote buying; (2) a Meade supporter was seen in possession of 20 or so absentee ballot applications that she delivered to Van Irvin, a county commissioner; (3) eight voters had been assisted by a single individual who was not shown to be qualified to assist these voters pursuant to OCGA § 21-2-409 (b) (2) and another voter was assisted by a person who likewise was not qualified to assist; (4) four absentee ballot applications reflected addresses different from the address at which the applicant was registered to vote; (5) four absentee ballot envelopes that reflected the voter received assistance in voting contained incomplete oaths in that they failed to

---

[3] See, e.g., *McIntosh County Bd. of Elections v. Deverger*, 282 Ga. 566 (651 SE2d 671) (2007); *Whittington v. Mathis*, 253 Ga. 653 (324 SE2d 727) (1985); *Bell v. Cronic*, 248 Ga. 457 (283 SE2d 476) (1981).

designate the disability that would authorize a person to assist the voter; and (6) 14 absentee ballots appeared to have been altered. First, we address the issue of whether the evidence supported the invalidation of a sufficient number of ballots to cast doubt upon or change the results of the election.

*Analysis of the evidence regarding specific challenged votes*

1. With respect to the finding of vote buying, only one witness testified he had been given money in exchange for his vote.[4] With respect to the finding that a Meade supporter delivered absentee ballot applications to another supporter who is a county commissioner, there is no evidence that this contributed to any illegal voting, and any conclusions reached based upon this finding would be unsupported speculation.[5]

With respect to the finding that eight voters had been assisted by one who was unqualified to assist them, the evidence reflects each of these voters was assisted by Andrea Stubbs, a convicted felon who was not qualified to vote. The trial court based its finding that Stubbs was unqualified to assist any of these electors on the ground that she was thus not a qualified elector of the precinct, as required by OCGA § 21-2-409 (b) (2) (A), and that she was not otherwise qualified to serve as an assistant pursuant to OCGA § 21-2-409 (b) (2) (B) because "she was not identified as a qualified family member" of each of the eight voters.[6] In fact, no evidence at all was presented regarding Stubbs's relation to these eight voters although the election

---

[4] Spalding testified he had been given $20 for his vote. Dawson testified she was paid money and given liquor by a Meade supporter but did not vote for Meade. She also testified her husband was given liquor but that he did not know the gift was connected with the election and in any event did not vote. Smith testified he was given $20 by County Commissioner Van Irvin, a Meade supporter, but denied knowing what it was for. As noted in the trial court order, hearsay testimony was presented that Meade and/or his supporters gave cash or liquor to voters, and the trial court stated that such testimony was disregarded. With the exception of Spalding, this evidence was insufficient to demonstrate that Williamson carried his burden of proof relating to vote buying. See *Hunt v. Crawford*, 270 Ga. 7 (507 SE2d 723) (1998).

[5] Although witnesses testified they saw a stack of papers that Meade supporter "Neet" Mackie carried in her purse and delivered to Irvin, and they described the papers as "ballots," the witnesses admitted they did not examine the papers, there was conflicting evidence with respect to whether the papers were actually absentee ballots, and the trial court found them to be absentee ballot applications.

[6] OCGA § 21-2-409 (b) (2) states:
In all other elections [than one in which a federal candidate is on the ballot], any elector who is entitled to receive assistance in voting under the Code section shall be permitted by the managers to select: (A) Any elector, except a poll officer or poll watcher, who is a resident of the precinct in which the elector requiring assistance is attempting to vote; or (B) The mother, father, grandparent, aunt, uncle, sister, brother, spouse, son, daughter, niece, nephew, grandchild, son-in-law,

supervisor testified that, in order to permit a voter to utilize an assistant, the assistant was required by a poll worker to sign an oath on the voting certificate as to his or her qualification to assist the voter. The trial court also found that Jeannette Jackson wrongly assisted voter Johnny Jackson because they were registered to vote in different precincts and no evidence was presented of any familial relationship. Likewise, no evidence was presented regarding the relation between Jeannette Jackson and Johnny Jackson. Assuming, without deciding, that the disqualification of these two assistants would invalidate these votes, Williamson, as the contestant, had the burden of proving they were not qualified, and he failed to carry it.[7] Instead, the trial court's order demonstrates the burden was improperly placed upon Meade to prove Stubbs and Jeannette Jackson were qualified to assist the identified voters. Thus, these nine ballots were not shown to be illegally cast.[8]

With respect to the finding that, contrary to the prohibition of OCGA § 21-2-381 (a) (1) (D),[9] four absentee ballot applications reflected addresses different from the address at which the applicant was registered to vote, this discrepancy does not establish that each of these ballots should be invalidated. First, the undisputed evidence shows one of these four ballots was mailed, at the written request of the registered voter (Mary B. Singletary), to an out-of-county address that was written in the space provided on the application to request that the ballot be mailed to a temporary out-of-county address or alternate address for a physically disabled person. The election supervisor testified she believed the address to be the out-of-county nursing home where the voter lived. Thus, the evidence supports the conclusion that the Singletary ballot was mailed in compliance with OCGA § 21-2-381 (a) (1) (D) either because the voter was disabled or

---

daughter-in-law, mother-in-law, father-in-law, brother-in-law, sister-in-law, or attendant care provider of the elector entitled to receive assistance.

[7] See, e.g., *Middleton v. Smith*, 273 Ga. 202 (539 SE2d 163) (2000) (reversing the invalidation of an election because the contestant failed to carry the burden of showing a specific number of illegal or irregular ballots sufficient to cast doubt on the results); *Walls v. Garrett*, 247 Ga. 640 (277 SE2d 903) (1981) (reversing the invalidation of an election because the contestant failed to carry his burden of proof of the irregularity of specific ballots).

[8] As a result of Williamson's failure to meet the burden of proof, we need not address his assertion that, because violation of the procedures set forth in OCGA § 21-2-385 (b) for voting with assistance by absentee ballot is a felony, this demonstrates that these procedures are mandatory and not mere technicalities.

[9] OCGA § 21-2-381 (a) (1) (D) states: "Except in the case of physically disabled electors residing in the county or municipality, no absentee ballot shall be mailed to an address other than the permanent mailing address of the elector as recorded on the elector's voter registration record or a temporary out-of-county or out-of-municipality address."

because it was otherwise properly mailed to a temporary out-of-county address. The application of Rubye Nell Hall shows on its face that it was an application for advance in-person voting.[10] Because it is reasonable to assume that Hall was properly identified, as required by OCGA § 21-2-417, when she cast her absentee ballot in person at the polling place, the fact that her absentee ballot was mailed to an in-county address other than the one reflected on her voter registration record provides no ground for invalidating her ballot.

That the two remaining absentee ballot requests at issue in the case (filed by Willie Bodiford and Manerva Crumbley) were each mailed to an in-county address other than the one reflected on the applicant's voter registration record is also insufficient to invalidate these voters' ballots. The election supervisor testified to the steps taken to verify the authenticity of the signature of an applicant for an absentee ballot against the signature on the voter registration card, as well as the steps taken to verify the authenticity of the signature of the voter on the space provided for the oath of the elector that is pre-printed on the return envelope in which the absentee ballot is mailed back to the Board of Registrars.

> Where the statute simply provides that certain acts or things shall be done within a particular time or in a particular manner, and does not declare that the performance is essential to the validity of the election, they will be regarded as merely directory unless they affect the actual merits of the election.

*Hastings v. Wilson*, 181 Ga. 305, 307 (182 SE 375) (1935) (citation omitted) (holding the statute requiring election returns to be made within three days did not require the Secretary of State to invalidate the results of a statewide referendum because they included returns from counties that reported late). We construe the language in OCGA § 21-2-381 (a) (1) (D) stating that, with noted exceptions, no absentee ballots shall be mailed to an address other than the permanent mailing address reflected on the applicant's voter registration record, to be directory and not to require, under the circumstances in this case, the ballots in question to be invalidated.

With respect to the finding that four absentee ballot envelopes reflecting the voter received assistance in voting contained incomplete oaths, this also does not require invalidation of these ballots.

---

[10] The definition of "absentee elector" includes a voter who casts an absentee ballot in person in early voting. See OCGA § 21-2-380 (a). The application of Rubye Nell Hall shows she checked a box labeled "Advance Voting (in person only)."

The trial court noted that these four ballot envelopes failed to designate the disability that would authorize a person to assist the voter. Pursuant to OCGA § 21-2-409 (a), the only grounds for receiving assistance in voting in an election are the voter's inability to read English or a disability that renders the voter unable to cast a ballot without assistance, such as a visual impairment. Each of the four ballot envelopes in question in this case reflects the voter executed the pre-printed oath of the elector that is required to be printed on the absentee ballot as set forth in OCGA § 21-2-384 (c) (1). Each ballot also reflects an individual executed the required pre-printed oath of a person assisting an elector and thus attested that the voter was entitled to receive assistance in voting under the provisions of OCGA § 21-2-409 (a). Each ballot also contained the statement required by OCGA § 21-2-384 (c) (1) providing notice that one who votes illegally by absentee ballot or one who illegally gives or receives assistance in voting shall be guilty of a felony. These four ballot envelopes, however, did not reflect a check mark next to the appropriate reason for assistance, as requested on the form. The instruction to check the appropriate box for reason for assistance was printed above the space for the signature of the oath of the person assisting.

Just as we have previously held that a voting officer's blunder in failing strictly to comply with the law should not serve to disenfranchise the voter, likewise the blunder of the person assisting an absentee voter by failing to specify the reason the voter needed assistance should not, without more, require the invalidation of these isolated ballots. Compare *Holton v. Hollingsworth*, 270 Ga. 591 (4) (514 SE2d 6) (1999) (an absentee ballot was properly counted even though the election manager erroneously approved an individual who was not a registered voter to assist the disabled voter in preparing the ballot); *Malone v. Tison*, 248 Ga. 209 (282 SE2d 84) (1981) (the remedy of disenfranchisement deemed inappropriate where the registrations of otherwise qualified voters were processed at registration places not properly advertised in compliance with statutory requirements). Though the reason for the voter's need for assistance was not provided on these four ballots, each bore the oath, under penalty of law, that the voter qualified for assistance.[11] Accordingly, the evidence does not support the conclusion that these four ballots should

---

[11] For this reason, we find these ballots "substantially complied with all . . . essential requirements of the [absentee ballot] form" and they are not required to be rejected for failure to furnish required information pursuant to OCGA § 21-2-386 (a) (1) (C). *Jones v. Jessup*, 279 Ga. 531, 533 (615 SE2d 529) (2005) (the trial court erred in finding certain absentee ballots should not have been counted because certain information was lacking on contested absentee ballots where, nevertheless, the voters each properly executed the oath of elector).

be invalidated, and the trial court's order does not reflect that such a conclusion was reached.[12]

With respect to the finding that 14 absentee ballots appeared to have been altered, we find the trial court erred in concluding these 14 ballots, even if invalidated, were sufficient in number to cast doubt upon the results of the election. The evidence shows these 14 ballots contain similar markings by which Williamson's name along with the circle next to his name was marked out and the circle next to Meade's name was filled in, as if to cast a vote for Meade. Testimony was presented that due to the irregularities with these ballots, they could not be tabulated by the voting machine and, after examination, were marked invalidated and then re-cast by officials with the board of registrars for Meade. The undisputed testimony established that the sealed envelopes in which these ballots were returned to the board of registrars did not appear to have been tampered with. Thus, at most, as the trial court concluded, "[i]t is only speculation as to for whom the votes were intended originally . . . ." Assuming, without deciding, that the evidence was sufficient to invalidate these 14 ballots, this would not be sufficient to change or cast doubt upon the results.

The margin of victory in this case was 39 votes. Even if all 14 of the disputed votes contained in the "marked up" absentee ballots were recast from Meade to Williamson and the one vote for which there was evidence of vote buying were deducted from Meade's total votes, the result of the election would not be changed.

### Analysis of the evidence regarding systemic irregularities

2. Having concluded that the evidence regarding specific contested ballots or votes does not show a sufficient number of irregular votes to change or cast doubt upon the results, we now consider whether the evidence is nevertheless sufficient to show the process or system was so irregular as to place in doubt the result of the election. We are aware of only one case in which this Court has ruled to invalidate an election on the ground that the process of the election or the scope of the irregularities shown in the election was sufficient to cast doubt upon the result without regard to whether the evidence showed a sufficient number of votes was placed in doubt to change the result.[13] In *Stiles v.*

---

[12] The facts of this case are distinguishable from those in *McCranie v. Mullis*, supra, where this Court found irregularities in a sufficient number of ballots to cast doubt on the election results, some of which involved the failure to give the required oaths to in-person voters receiving assistance in voting.

[13] In *State of Ga. v. Carswell*, 78 Ga. App. 84 (50 SE2d 621) (1948), the Court of Appeals of Georgia also invalidated the result of an election approving a resolution to issue revenue bonds where the evidence showed a total failure by election officials to comply with the Secret Ballot Law.

*Earnest*, 252 Ga. 260, supra, this Court ruled to invalidate the results of a referendum proposing that members of the county school board be elected as opposed to appointed by the grand jury. The evidence showed election officials allowed county school employees, including the high school principal, to stand, in some cases, within 250 feet of the polling places, while checking off voters from a voting list. This court noted that pursuant to the opinion of the Attorney General, it is " 'not . . . permissible for anyone, including candidates and their workers, to engage in . . . observing voters and checking a voters' list, outside the polling place but within the 250-foot limit.' Op. Atty. Gen. 82-30, at p. 63." Id. at 262. This Court concluded "that the illegality attendant upon the referendum is such as is 'sufficient to change or place in doubt the result' thereof . . . and another referendum must be held." Id.

By contrast, in *Middleton v. Smith*, 273 Ga. 202 (539 SE2d 163) (2000), where a sheriff engaged in questionable campaign conduct on behalf of certain county commissioner candidates, this Court reversed the trial court's order invalidating the election because the challenger failed to show a specific number of illegal or irregular ballots sufficient to change or cast doubt upon the results. Finding the assertion that the sheriff's improper campaign activities at one precinct put all of that precinct's votes in doubt was based on mere speculation, this Court stated: "It is not sufficient to show irregularities which simply erode confidence in the outcome of the election. Elections cannot be overturned on the basis of mere speculation." Id. at 203. Williamson urges this Court to adopt the analysis of then Chief Justice Benham's dissent in *Middleton,* which cautioned against focusing excessively narrowly on specific ballots while ignoring facts demonstrating that the entire election process was debased. See *Middleton,* id. at 204-205. In *Middleton,* however, the trial court found numerous instances of the sheriff's improper attempts to influence votes in favor of certain candidates for county commissioners, such as mailing approximately 1,200 letters to voters, over official stationary, urging them to vote for his candidates, offering to "help" a convicted felon who performed community service at the sheriff's department if he would help these candidates, offering to "help" a voter who was facing DUI charges, as well as evidence the sheriff prepared and distributed 18 absentee ballot applications. On this evidence, the dissent in *Middleton* concluded the wrongdoing was so widespread and systemic "as to render it virtually impossible to identify defective ballots or intimidated voters individually." Id. at 205.

Williamson also asserts that this Court's holding in *McCranie v. Mullis,* supra, affirming invalidation of an election, requires invalidation in this case. Williamson asserts that here, as in *McCranie,* the

irregularities amount to violations of election law and therefore they require invalidation because the election results are placed in doubt. Williamson distinguishes *Middleton* because there the irregularities were merely ethical violations by the sheriff, who was not the candidate but the candidates' supporter, and this Court noted that it was not necessary to invalidate the election because of the sheriff's misconduct when he could be disciplined in other ways. *Middleton*, supra at 204. Even in *McCranie*, however, a sufficient number of irregular votes was shown which would cast doubt upon the result of the election. *McCranie*, supra at 417.

In the case now before us, evidence of systemic misconduct for vote buying and alleged wrongful distribution of absentee ballots is largely speculative and is insufficient to support the trial court's conclusion that irregularities in the election process were shown to cast doubt upon the results. Williamson presented evidence of only one illegally bought vote and the remaining evidence of vote buying was based upon hearsay and gossip. Insufficient evidence was presented to conclude any misconduct relative to the distribution of absentee ballots. No evidence at all was presented to support the conclusion that unqualified persons were wrongly permitted to assist voters. Evidence relating to alleged improprieties in absentee ballot voting is also insufficient to invalidate the results of this election. Even if we accept the finding that 14 absentee ballots appear to have been altered, this also does not support the invalidation of the results of the election. Since there was no evidence of tampering of the official envelopes in which the ballots were returned to the board of registrars, it is purely speculative that the alterations were made by anyone other than the voters. The evidence falls short of demonstrating systemic irregularities in the election process.

Because Williamson failed to carry the burden of demonstrating the election results should be invalidated either by establishing a sufficient number of specific irregular or invalid votes to change or place in doubt the results, or by establishing sufficient irregularities in the election process to cast doubt upon the results, we reverse the trial court's order invalidating the election results.

*Judgment reversed. All the Justices concur.*

DECIDED JUNE 3, 2013.

*Whitehurst, Blackburn & Warren, R. Bruce Warren, Christopher K. Rodd, Malia Phillips-Lee*, for appellant.

*Gatewood, Skipper & Rambo, James M. Skipper, Jr.*, for appellee.