312 Ga. 306
FINAL COPY

S21A0591.  SMITH v. LONG COUNTY BOARD OF ELECTIONS
AND REGISTRATION et al.

MCMILLIAN, Justice.

Appellant Bobby Harrison Smith ran against Teresa Odum for the office of Probate Judge of Long County on June 9, 2020 (the "Election").[1] Following Odum's victory, Smith filed a petition to contest the Election results, alleging there were (1) irregularities committed by election officials, (2) illegal votes cast in the election, and (3) wrongfully rejected votes (collectively "irregularities"). After a three-day bench trial, the trial court concluded that the evidence was insufficient to cast doubt on the results of the Election and denied the petition. Smith now appeals, asserting in four related enumerations of error that the trial court erred by not ordering a new election. For the reasons that follow, we affirm.

---

[1] A number of candidates for other offices were also on the ballot, but they are not at issue in this appeal.

Construed in the light most favorable to the trial court's ruling,[2] the evidence shows that the results of the Election were certified on June 19, 2020, showing a total of 2,735 votes, with 1,372 cast for Odum and 1,363 cast for Smith. The Long County Board of Elections and Registration (the "Board") conducted a recount of the Election results, in which additional mail-in absentee ballots were located and one provisional ballot allocated to Odum was reallocated to Smith. The results of the recount were certified on June 26, 2020, showing the same nine-vote margin of victory for Odum with a total of 2,741 votes — 1,375 cast for Odum and 1,366 cast for Smith. Smith filed a "Petition to Contest Election Result and Request for New Election" against the Board and Odum on July 1, 2020, which he amended on August 28, 2020.

Smith claimed that 30 votes were improperly or irregularly cast and categorized these votes at trial into five different "Buckets."

---

[2] See, e.g., *Smith v. Northside Hospital, Inc.*, 302 Ga. 517, 520 (807 SE2d 909) (2017) ("In reviewing a bench trial, we view the evidence in the light most favorable to the trial court's rulings, defer to the trial court's credibility judgments, and will not set aside the trial court's factual findings unless they are clearly erroneous." (citation and punctuation omitted)).

According to Smith, eight "Blanks" failed to properly complete their absentee ballot applications or absentee ballots. Five "Outsiders" who lived outside of Long County improperly cast a vote in the Election, and two "Movers" allegedly voted in the Election despite having moved out of Long County more than 30 days before the Election. Seven "Doubles" allegedly cast two ballots in the Election. In the final Bucket, Smith challenged eight "Unverifieds," whose in-person early voting applications do not indicate that their identification was checked by the poll workers.[3] Odum and the Board acknowledge that seven votes were improperly cast: six individuals who voted twice and another individual who had never resided in Long County. At trial, the following evidence was presented.

(a) *Blanks.* Mele Savea, who Smith contends failed to sign the oath of elector ("Oath") on her absentee ballot, testified that she

---

[3] Because the parties and the trial court adopted Smith's nomenclature, we use these terms in this opinion only for the sake of clarity and specifically note that we do not endorse this terminology.

3

voted for the first time in 2020 and that she accidentally did not sign on the line provided for her signature on the Oath.[4] She also testified that she did not receive anything from the Board telling her that she needed to correct anything on her ballot and that the absentee ballot she submitted accurately reflected the vote she wanted to cast.

Lonnie Fowler testified that he cannot read or write and that he asked his wife, who helps him with all his "legal matter[s]," to fill in his choices and sign the Oath for him on his absentee ballot.

Smith alleged that Sajah Jones, who was unavailable to testify at trial due to her active military duties, failed to sign her absentee ballot application and that her signature for the Oath did not match her voter registration signature. Sajah's mother, Fredericka Jones, testified that Sajah was excited to vote for the first time and that she saw Sajah sign the Oath, but Fredericka agreed that Sajah's signature on her voter registration card looked different from the signature on her Oath. Fredericka received correspondence from the

---

[4] Savea's Oath was submitted as an exhibit at trial and shows that Savea wrote her name on a line directly under the line provided for the signature.

4

Board regarding verification of Sajah's signature,[5] but forgot about it because she was preparing her daughter for basic training.

Wesley Worthy testified that he is active-duty military and a permanent resident of Long County. Although his stepmother, Thelma Worthy, assisted him in the application process for an absentee ballot, he personally signed the Oath on the absentee ballot. He confirmed that the signatures on his voter registration card and the Oath were his. He agreed that the signatures may appear "a little different" because he signed his voter registration card on an electronic pad. Thelma testified that she did not know she was not permitted to request an absentee ballot for her stepson, whom she had raised since he was an infant. She denied filling out the actual ballot or signing the Oath for him.

Roy Odum (no relation to Teresa Odum) testified that his wife Bethany Odum filled out his absentee ballot application to help him while he was working out of town. He testified that he personally signed the Oath on the ballot and that it looked like his handwriting

---

[5] This correspondence is not included in the record.

and not his wife's. He also confirmed that the handwriting on both the Oath and his voter registration card was his. Although he agreed the signatures looked different, he explained that sometimes his signature looks different depending on when and how he signed it. Bethany testified that she and her husband discussed the candidates he wanted to vote for, that she filled in the bubbles on the ballot, and that they then confirmed that his choices were reflected on his absentee ballot before Roy personally signed the Oath.

Elizabeth Elarbee, who was 84 years old at the time, did not sign her absentee ballot application. However, she testified that she completed the application herself and must have accidentally failed to sign the application. She confirmed that she signed the Oath on the absentee ballot she submitted.

Mary Poppell testified that her daughter-in-law helped request her absentee ballot because Poppell was caring for her dying husband at the time. She later filled out the absentee ballot she received without assistance and signed the Oath herself. She

6

testified that the ballot accurately reflected her vote.

Eva Ashley testified that she filled out the information in the absentee ballot application herself but must have forgotten to sign it. She later completed the absentee ballot at home and signed the Oath.

Trynina Harris, the Board's Supervisor, testified that the Board sent affidavits to those voters who did not sign their absentee ballot applications or whose signatures did not appear to match their voter registration card, but did not specifically testify whether affidavits had been sent to the Blanks. She also did not have personal knowledge of which voters returned their affidavits. She explained that if a voter printed his or her name instead of signing, the Board tried to compare the writing to that on the voter's registration card. Harris also testified that citizens who requested an absentee ballot for someone they were assisting were sometimes confused by the application and signed the application as the requester rather than the assister.

(b) *Outsiders.* Smith called Mark Davis as an expert witness in

7

digital mapping and geocoding and voter data analytics. Relying on United States Census data, Davis testified that David and Cheryl Keetch, Stanley and Diana Edwards, and Shaana Ito actually live in Liberty County and that the Long County property tax records were incorrect. He admitted that geocoding is "not a perfect science" and that surveys conducted with modern survey equipment are "extremely accurate," but testified that the United States Census Bureau should have the most updated county lines.

Each of the Outsiders testified at trial that, although they have a Hinesville[6] address for mailing purposes, they believed their property to be located in Long County, they paid property taxes in Long County, they had held themselves out to be Long County residents for years preceding the election, and they were registered voters in Long County when they voted in the Election. Scott Wall, the mapping and GIS supervisor for the Long County Board of Assessors, testified that in 2011, the Southeast Georgia Surveying Company was commissioned to conduct a survey based on the legal

---

[6] Hinesville is the county seat of neighboring Liberty County.

description contained in the 1920 amendment to the Georgia Constitution that created the Long County boundaries. The resulting survey was accurate to within one foot. Through Wall, the Board introduced certified copies of the commissioned survey map and the Long County tax map, both of which showed that the Outsiders' homes were located inside Long County. Wall explained that, although one property was located in both Long County and Liberty County, the county commissioners agreed that the property would be taxed in Long County because the driveway to the property was in Long County.

(c) *Movers.* The Board and Odum concede that one Mover was never a resident of Long County and should not have voted in the Election. The remaining Mover, Grant DeLoach, is Smith's first cousin. At trial, DeLoach claimed that he moved to Chatham County in 2017, that he had filed for a homestead exemption in Chatham County, and that his driver's license listed a Chatham County

9

address.[7] On cross-examination, however, DeLoach admitted that he was aware that someone had challenged his eligibility to vote in the Election, where both his mother and father were also on the ballot, and that he assumed that the Board determined that he was eligible to vote in Long County because he received the absentee ballot he had requested. He did not register to vote in Chatham County until several months after the Election.

Mildred Hopkins, the Board's Deputy Registrar, testified that DeLoach's eligibility to vote in the Election had been challenged after DeLoach requested an absentee ballot, but the Board deemed him eligible and allowed him to vote. She did not, however, have personal knowledge of the substance of that determination.

(d) *Doubles.* Each of the seven Doubles testified at trial. The Board concedes that six of those voters cast an in-person ballot in the Election without their absentee ballots being properly

---

[7] Smith did not introduce any documentary evidence in support of these claims.

cancelled.[8] As to the final voter, Charles Sayre testified that he had requested an absentee ballot but never received it, so he voted in person on the day of the Election, which was the only time he voted in the Election. Harris explained that Sayre had requested a mail-in absentee ballot, but when she received his application, she was in the middle of processing both absentee applications and in-person early voters and accidentally entered him in the system as an in-person early voter. She was certain that Sayre had only voted once — on the day of the Election. She recalled a poll worker contacting her on the day of the Election to confirm whether Sayre had voted, and she was able to determine that she had made an error and told the poll worker to allow Sayre to vote in person.

(e) *Unverifieds.* Smith claimed that the applications of eight voters for an in-person absentee ballot[9] failed to show that government-issued proof of identification was checked at the time

---

[8] The Board presented testimony that many voters were confused when the Election was postponed from May to June 2020 during the COVID-19 pandemic.

[9] Early in-person voting is a type of absentee voting. See OCGA § 21-2-385 (c).

the voters cast their ballots. Every voter identified by Smith testified that they remembered providing an appropriate election official with identification when they cast their vote. Hopkins testified that every in-person voter's identification is checked twice before they are allowed to vote; that she was confident that an individual would not have been allowed to vote without appropriate identification; and that it would have been a "clerical error" if an in-person ballot application did not indicate that identification had been checked. Both Hopkins and Harris testified that the section of the ballot application regarding the type of identification presented to the poll worker is for the Board's internal office use.

(f) *The trial court's order*. In its detailed order denying the petition, the trial court found that six absentee ballots were issued from flawed applications or the voters had submitted flawed absentee ballots, including one ballot without an executed Oath and one ballot with a signature that did not match the voter registration card. However, the trial court noted that, of these technical flaws, only one was brought to the voter's attention, and there was no

evidence that the ballots were the result of undue influence or otherwise did not reflect the will of the voters. With the exception of a single Mover, the trial court found no evidence that any voter or election official knowingly acted with possible fraudulent or malicious intent. The trial court, however, specifically questioned the credibility of DeLoach and concluded that Smith's assertion that DeLoach's vote was evidence of an irregularity was "quite disingenuous." The trial court also found the testimony of the Unverifieds credible and that the evidence demonstrated that they produced compliant identification. Finally, the trial court found that the Board produced sufficient evidence of a certified survey to demonstrate that the Outsiders are residents of Long County.

1. Smith first alleges that the trial court applied an incorrect standard in denying his petition for a new election. We begin by emphasizing that

> [e]llections are critical to our democratic republic. We give great credence to the choices citizens make when they engage in the democratic process by voting to select their representatives [a]nd . . . afford great weight to election results. Indeed, the setting aside of an election in which

13

the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person challenging an election has clearly established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt.

*Martin v. Fulton County Bd. of Registration and Elections*, 307 Ga. 193, 193-94 (835 SE2d 245) (2019) (citation and punctuation omitted). To that end, "[i]t is presumed that election returns are valid, and the party contesting the election has the burden of showing an irregularity or illegality sufficient to change or place in doubt the result of the election." *Meade v. Williamson*, 293 Ga. 142, 143 (745 SE2d 279) (2013) (citation and punctuation omitted). The challenger need not establish for whom the disputed electors cast their ballots, only that the illegal or irregular ballots were sufficient in number to cast doubt on the results of the election. See *Taggart v. Phillips*, 242 Ga. 454, 455 (249 SE2d 245) (1978). See also *McIntosh County Bd. of Elections v. Deverger*, 282 Ga. 566, 566 (2) (651 SE2d 671) (2007) (A challenger "need not establish how the rejected voters would have voted; he need only establish that

sufficient legal votes were rejected to change or place in doubt the result." (citation and punctuation omitted)).

Elections in Georgia can be set aside under two different, but related, circumstances. In the majority of cases, involving the first paradigm, we have focused on the margin of victory as the threshold of materiality required to place the election's results in doubt. See *Meade*, 293 Ga. at 148 (1) (even if all 14 disputed votes were invalidated, the results of the election would not be changed where the margin of victory was 39 votes); *Deverger*, 282 Ga. at 568 (3) (given four-vote margin of victory, wrongful rejection of four votes was sufficient to place results in doubt); *Mead v. Sheffield*, 278 Ga. 268, 271 (601 SE2d 99) (2004) ("[T]he focus in an election contest involving illegal ballots is on whether they exceeded the margin of victory." (citation and punctuation omitted)). "The second paradigm involves cases where a party alleges systemic irregularities in the election process that may not be measurable in the same discrete manner that is used in cases falling within the first paradigm." *Martin*, 307 Ga. at 223 (3) (a). "Under this second set of

circumstances — which we have identified in far fewer cases — we have recognized that the result of an election may be voided where systemic irregularities in the process of the election are sufficiently egregious to cast doubt on the result." Id. (citation and punctuation omitted).[10] Under either paradigm, we will not disturb a trial court's findings in an election contest unless clearly erroneous. See *Meade*, 293 Ga. at 143; *Banker v. Cole*, 278 Ga. 532, 533 (1) (604 SE2d 165) (2004).

Smith, expressly focusing on the first paradigm,[11] asserts that the trial court applied the wrong standard by requiring that each Bucket contain sufficient irregularities, as opposed to requiring the cumulative total of irregularities to be greater than the margin of

---

[10] As we noted in *Martin*, however, the margin of victory remains relevant "in evaluating whether a contestant has cast doubt on an election, even when a party alleges systemic irregularities," and under both paradigms, "the margin of victory serves as a kind of materiality threshold for evaluating whether a party has placed in doubt the result of an election." 307 Ga. at 227 (3) (d) n.32 (citation and punctuation omitted). No party challenges the trial court's determination that the nine-vote margin of error is the materiality threshold in this case. Accordingly, we need not address our continued doubts regarding the mathematical formula set out in *Fuller v. Thomas*, 284 Ga. 397, 397-98 (1) (667 SE2d 587) (2008). See *Martin*, 307 Ga. at 228 n.33.

[11] Because Smith does not provide any argument on the second paradigm, we do not address it.

victory. To support this argument, Smith points to language in the trial court's order stating that "[n]one of the 'buckets'/categories offered overcome the margin of victory in this election standing alone." After reviewing the record as a whole and the context of the quoted language in the order, we do not agree with Smith's reading of the trial court's order. At the conclusion of the bench trial, the trial court engaged in a lengthy discussion with the parties regarding both the factual disputes and the standard to be used in reaching its conclusion. In particular, the trial court agreed that Smith was required to show that at least nine votes were irregular, stating:

> Because the way I'm looking at it, . . . is that our threshold number is nine. . . . [The Doubles are] six to start off with being illegal period. [A Mover] is number seven. . . . I've got to determine whether or not there are two others, as to whether or not they're illegal or irregular.

Thus, the trial transcript shows that the trial court correctly considered the cumulative effect of the Buckets in determining whether Smith had reached the proper threshold. And in its order denying Smith's petition, the trial court quoted extensively from

17

*Martin* before concluding that under either paradigm identified in that case, the margin of victory was relevant in evaluating whether a petitioner has cast doubt on an election and that Smith had shown only six Doubles and one Mover cast irregular votes, such that he was unable to prove sufficient voting irregularities to cast doubt on the results of the Election.[12] In other words, the trial court found that Smith had cast doubt on a total of only seven votes in an election where the margin of victory was nine votes. Accordingly, this enumeration of error fails.

2. Smith next asserts that the trial court erred by finding that the ballots cast by the Blanks were properly counted in the Election. We disagree.

Former OCGA § 21-2-381 (b) (1)[13] requires that when election officials receive a timely absentee ballot application, they

   shall determine . . . if the applicant is eligible to vote in

---

[12] Within this enumeration of error, Smith also argues in passing that the trial court erred in its determinations regarding the Unverifieds and one Double. However, for the reasons set forth below in Divisions 3 and 4, this argument also fails. See *Banker*, 278 Ga. at 533 (1) (we will not disturb a trial court's findings in an election contest unless clearly erroneous).

[13] OCGA § 21-2-381 was amended as of July 1, 2021.

18

the primary or election involved. In order to be found eligible to vote an absentee ballot by mail, the registrar or absentee ballot clerk shall compare the identifying information on the application with the information on file in the registrar's office and, if the application is signed by the elector, compare the signature or mark of the elector on the application with the signature or mark of the elector on the elector's voter registration card.

According to Smith, the requirement to properly complete an absentee ballot application pursuant to OCGA § 21-2-381 (b) (1) is not a ministerial task and the Blanks' failure to do so rendered their subsequently cast ballots invalid.[14] We have explained, however, that "not every irregularity will invalidate an elector's vote." *Jones v. Jessup*, 279 Ga. 531, 532 (615 SE2d 529) (2005). And, "[w]here the election is held in substantial compliance with the law, it should not be rendered void merely because of isolated failures to conform strictly with the law unless it appears that such failures changed the results of the election." Id. (citation and punctuation omitted).

---

[14] Smith's reliance on *Brodie v. Champion*, 281 Ga. 105, 106-07 (636 SE2d 511) (2006), is misplaced. In that case, we explained that where the voters had cast their ballot for a write-in candidate who was not constitutionally qualified to hold office, their votes were considered a nullity, a situation that is not presented here.

OCGA § 21-2-381 (b) (3) provides that if an elector is found ineligible, the board of registrars

> . . . shall deny the application by writing the reason for rejection in the proper space on the application and shall promptly notify the applicant in writing of the ground of ineligibility . . . . However, an absentee ballot application shall not be rejected due to an apparent mismatch between the signature of the elector on the application and the signature of the elector on file with the board of registrars. In such cases, the board of registrars or absentee ballot clerk shall send the elector a provisional absentee ballot with the designation "Provisional Ballot" on the outer oath envelope and information prepared by the Secretary of State as to the process to be followed to cure the signature discrepancy. If such ballot is returned to the board of registrars or absentee ballot clerk prior to the closing of the polls on the day of the primary or election, the elector may cure the signature discrepancy by submitting an affidavit to the board of registrars or absentee ballot clerk along with a copy of one of the forms of identification enumerated in subsection (c) of Code Section 21-2-417 before the close of the period for verifying provisional ballots contained in subsection (c) of Code Section 21-2-419 . . . .

This subsection makes clear that the remedy for receipt of an ineligible absentee ballot application is to notify the elector and provide an opportunity to cure any discrepancy, not to automatically reject any subsequent ballot that may be issued. See Ga. Comp. R.

20

& Regs. r. 183-1-14-.11 ("During early voting, . . . the board of registrars . . . shall mail or issue official absentee ballots or provisional absentee ballots, if appropriate, to . . . applicants immediately upon determining their eligibility. The board . . . shall make such determination and mail or issue official absentee ballots; provisional absentee ballots, if appropriate, or notices of rejection of absentee ballot applications . . . within 3 business days after receiving the absentee ballot applications."). "[I]ndeed, in the absence of notice to the challenged voter it may be unconstitutional, as well as a violation of state law[,]" to disenfranchise the voter. *Malone v. Tison*, 248 Ga. 209, 214 (3) (282 SE2d 84) (1981) (even where a statutory requirement is mandatory, the appropriate mechanism for enforcement may be by mandamus or injunction against the registrars in the future rather than disenfranchisement of current voters).

Here, based on the testimony and other evidence presented at trial, the trial court was authorized to find that, although the evidence was conflicting as to whether the Board failed to provide

notification and an opportunity to cure application irregularities in all but one instance, each of the Blanks was otherwise eligible to vote in the Election and their absentee ballots accurately reflected their choices. Accordingly, the trial court did not err in refusing to reject the Blanks' ballots. See *Meade*, 293 Ga. at 147 (1) ("Just as we have previously held that a voting officer's blunder in failing strictly to comply with the law should not serve to disenfranchise the voter, likewise the blunder of the person assisting an absentee voter by failing to specify the reason the voter needed assistance should not, without more, require the invalidation of these isolated ballots."); *Jones*, 279 Ga. at 532 (failure to comply strictly with provisions of former OCGA § 21-2-381 did not warrant rejection of electors' votes); *Johnson v. Rheney*, 245 Ga. 316, 319-20 (6) (264 SE2d 872) (1980) (concluding that 12 absentee ballots that were issued to electors who did not apply for them but were properly executed and returned nonetheless expressed the will of the voter and were not sufficient to overturn the election); *Hastings v. Wilson*, 181 Ga. 305, 307, 308-09 (182 SE 375) (1935) (failure to observe directory provisions of

22

election statutes will not, in the absence of fraud, nullify an election that shows a fair and honest expression of the elector's will).

3. Smith next argues that the trial court erred by finding that DeLoach was eligible to vote in the Election because DeLoach testified that he considered himself a resident of Chatham County. Again, we disagree.

Among other qualifications, a voter must be a resident of the county or municipality in which he or she seeks to vote. See OCGA § 21-2-216 (a) (4). An individual's residence is "that place in which such person's habitation is fixed, without any present intention of removing therefrom[.]" OCGA § 21-2-217 (a) (1). And a person does not lose residence by leaving his or her home and going into another state or county "for temporary purposes only, with the intention of returning, unless such person shall register to vote or perform other acts indicating a desire to change such person's citizenship and residence[.]" OCGA § 21-2-217 (a) (2). "Findings of fact regarding voters' residency shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to

23

judge the credibility of the witnesses." *Holton v. Hollingsworth*, 270 Ga. 591, 594 (5) (514 SE2d 6) (1999) (citation and punctuation omitted).

Here, the evidence showed that DeLoach was aware that someone had challenged his eligibility to vote in the Election[15] and that he nonetheless received an absentee ballot for the Long County Election that he had personally requested. In addition, Odum elicited on cross-examination that DeLoach was raised in Long County, where he had always previously voted, that he had only registered to vote in Chatham County two weeks prior to trial, well after the Election, and that he was related to Smith. Records further showed that the absentee ballot completed by DeLoach in connection with the Election identified his permanent residence in Long County. The trial court was free to disregard DeLoach's testimony to the contrary, including that he "considered [his] permanent residence to be in Chatham County," particularly where no

---

[15] See OCGA § 21-2-230 (permitting an elector to challenge a person's right to vote in a particular election).

24

corroborating documentation was provided. See *Mathenia v. Brumbelow*, 308 Ga. 714, 716 (1) (843 SE2d 582) (2020) (trier of fact is not obligated to believe a witness even if the testimony is uncontradicted and may accept or reject any portion of the testimony). Thus, we cannot say that the trial court's finding in this respect was clearly erroneous. See *Parham v. Stewart*, 308 Ga. 170, 174 (2) (a), (b) (839 SE2d 605) (2020) (affirming trial court's rejection of election challenge where trial court did not clearly err in its credibility determinations).

4. In his final enumeration of error, Smith maintains that the trial court erred by finding that the Outsiders were eligible to vote. Although the evidence was conflicting, because the Board introduced a certified survey showing that the Outsiders were located within Long County and paid property taxes to Long County, we cannot say that the trial court's findings were clearly erroneous. See *Bell v. Cronic*, 248 Ga. 457, 461 (2) (283 SE2d 476) (1981) (trial court's finding regarding voters' residency was authorized based on property survey evidence).

5. In conclusion, the evidence presented at trial supports the trial court's determination that, of the challenged electors, only the ballots of six Doubles and one Mover should be rejected. Those seven ballots are not sufficient to place the results of the Election in doubt given the nine-vote margin of victory in this case. Accordingly, we discern no error in the trial court's denial of Smith's petition to contest the Election. See *Meade*, 293 Ga. at 148 (1).

*Judgment affirmed. All the Justices concur, except Boggs, P. J., and Peterson, J., not participating.*

Decided August 24, 2021.

Election contest. Long Superior Court. Before Judge Morse from Eastern Circuit.

*Holland & Knight, James C. Evans, Philip J. George III, Robert S. Highsmith, Jr.*, for appellant.

*Osteen Law Group, C. Joel Osteen; James B. Smith*, for Long County Board of Elections and Registration.

*Jones Osteen & Jones, Luke R. Moses*, for Teresa L. Odum.